**Nancy Beth CRUZAN, By co-guardians, Lester L. CRUZAN, Jr. & Joyce Cruzan, Respondents,**

v.

**Robert HARMON, et al., Appellants,**

v.

**Thad McCANSE, Appellant–Guardian Ad Litem.**

**No. 70813.**

Supreme Court of Missouri, En Banc.

Nov. 16, 1988.

Rehearing Denied Dec. 13, 1988.

William L. Webster, Atty. Gen., Robert Presson, Ass't. Atty. Gen., Robert Northcutt, Gen. Counsel, Missouri Dept. of Health, Jefferson City, Thad C. McCanse, David B. Mouton, Carthage, for appellants.

William H. Colby, Kansas City, Walter E. Williams, Joplin, for respondents.

Carter G. Phillips, counsel of record, Mark E. Haddad, Washington, D.C., Mark A. Thornhill, Kansas City, Kirk B. Johnson, Edward B. Hirshfeld, Chicago, Ill., for amicus curiae American Medical Ass'n.

David E. Everson, Jr., Kansas City, for amicus curiae, American Academy of Neurology.

Stanley S. Herr, University of Maryland, School of Law, Baltimore, Md., Blake Wolf, Joplin, James Bopp, Jr., Thomas J. Marzen, Mary M. Nimz, Daniel Avila, Teresa Kealy, Joel M. Barkow, Nat. Legal Center for the Medically Dependent and Disabled, Inc., Indianapolis, Ind., for amicus curiae, Assn. for Retarded Citizens of the U.S. and the Ethics and Advocacy Task Force of the Nursing Home Action Group.

Giles R. Scofield, III, New York City, Richard D. Watters, St. Louis, for amicus curiae, Concern For Dying.

Jane Adams Nangle, St. Louis, Fenella Rouse, M. Rose Gasner, Elena N. Cohen, Richard Wasserman, New York City, for amicus curiae Soc. for the Right to Die.

James S. Cole, St. Louis, for amicus curiae, Missouri Citizens for Life.

Kathleen M. Boozang, St. Louis, for amicus curiae, SSM Health Care System and the Center for Health Care Ethics, St. Louis University Medical Center.

ROBERTSON, Judge.

Nancy Cruzan lies in a persistent vegetative state in the Mount Vernon State Hospital. Lester L. Cruzan, Jr., and Joyce Cruzan, her parents and co-guardians, requested that employees of the hospital terminate artificial hydration and nutrition for Nancy. The hospital's employees refused to carry out this request without authority from a court. The Cruzans filed a declaratory judgment action seeking a judicial sanction of their wishes. Following a hearing, the trial court entered its order directing the employees of the State of Missouri to "cause the request of the co-guardians to withdraw nutrition or hydration to be carried out." The trial court held that to the extent that Sections 459.010(3) and 459.055, RSMo 1986, set forth a public policy of the General Assembly prohibiting the withholding and withdrawal of nutrition and hydration under all circumstances, such statutes violate Nancy Cruzan's right to liberty, due process of law and equal protection under the state and federal constitutions. Both the state and the guardian *ad litem* appealed.[1] A single issue is presented: May a guardian order that all nutrition and hydration be withheld from an incompetent ward who is in a persistent vegetative state, who is neither dead within the meaning of Section 194.005, RSMo 1986, nor terminally ill? We have jurisdiction. Mo. Const. art. V, § 3. Because we find that the trial court erroneously declared the law, we reverse.

I.

We review this case under *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). The judgment of the trial court "will be sustained ... unless there is no substantial evidence to support it, unless it is against the weight of the evidence, unless it erroneously declares the law, or unless it erroneously applies the law."

At 12:54 a.m., January 11, 1983, the Missouri Highway Patrol dispatched Trooper Dale Penn to the scene of a single car

1. The guardian *ad litem* finds himself in the predicament of believing that it is in Nancy's "best interest to have the tube feeding discontinued," but "feeling that an appeal should be made because our responsibility to her as attorneys and guardians *ad litem* was to pursue this matter to the highest court in the state in view of the fact that this is a case of first impression in the State of Missouri."

accident in Jasper County, Missouri. Penn arrived six minutes later to find Nancy Beth Cruzan lying face down in a ditch, approximately thirty-five feet from her overturned vehicle. The trooper examined Nancy and found her without detectable respiratory or cardiac function.

At 1:09 a.m., Paramedics Robert Williams and Rick Maynard arrived at the accident scene; they immediately initiated efforts to revive Nancy. By 1:12 a.m., cardiac function and spontaneous respiration had recommenced. The ambulance crew transported Nancy to the Freeman Hospital where exploratory surgery revealed a laceration of the liver. A CAT scan showed no significant abnormalities of her brain. The attending physician diagnosed a probable cerebral contusion compounded by significant anoxia (deprivation of oxygen) of unknown duration. The trial judge found that a deprivation of oxygen to the brain approaching six minutes would result in permanent brain damage; the best estimate of the period of Nancy's anoxia was twelve to fourteen minutes.

Nancy remained in a coma for approximately three weeks following the accident. Thereafter, she seemed to improve somewhat and was able to take nutrition orally. Rehabilitative efforts began. In order to assist her recovery and to ease the feeding process, a gastrostomy feeding tube was surgically implanted on February 7, 1983, with the consent of her (then) husband.

Over a substantial period of time, valiant efforts to rehabilitate Nancy took place, without success. She now lies in the Mount Vernon State Hospital.[2] She receives the totality of her nutrition and hydration through the gastrostomy tube.

The trial court found that (1) her respiration and circulation are not artificially maintained and are within the normal limits of a thirty-year-old female; (2) she is "oblivious to her environment except for reflexive responses to sound and perhaps painful stimuli"; (3) she suffered anoxia of the brain resulting in a "massive enlargement of the ventricles filling with cerebrospinal fluid in the area where the brain has degenerated" and that "cerebral cortical atrophy is irreversible, permanent, progressive and ongoing"; (4) "her highest cognitive brain function is exhibited by her grimacing perhaps in recognition of ordinarily painful stimuli, indicating the experience of pain and apparent response to sound"; (5) she is a spastic quadriplegic; (6) her four extremities are contracted with irreversible muscular and tendon damage to all extremities; (7) "she has no cognitive or reflexive ability to swallow food or water to maintain her daily essential needs" and that "she will never recover her ability to swallow sufficient [sic] to satisfy her needs." In sum, Nancy is diagnosed as in a persistent vegetative state. She is not dead.[3] She is not terminally ill. Medical experts testified that she could live another thirty years.

The trial court found that Nancy expressed, in "somewhat serious conversation" that if sick or injured she would not want to continue her life unless she could live "halfway normally." Based on this conversation, the trial court concluded that "she would not wish to continue with nutrition and hydration."

The court concluded that no state interest outweighed Nancy's "right to liberty" and that to deny Nancy's co-guardians authority to act under these circumstances would deprive Nancy of equal protection of the law. The court ordered state employees to "cause the request of the co-guardi-

---

**2.** The court determined that the State is bearing the entire economic cost of Nancy's care.

**3.** Section 194.005, RSMo 1986, provides:
   For all legal purposes, the occurrence of human death shall be determined in accordance with the usual and customary standards of medical practice, provided that death shall not be determined to have occurred unless the following minimal conditions have been met:

(1) When respiration and circulation are not artificially maintained, there is an irreversible cessation of spontaneous respiration and circulation; or

(2) When respiration and circulation are artificially maintained, and there is total and irreversible cessation of all brain function, including the brain stem and that such determination is made by a licensed physician.

ans to withdraw nutrition or hydration to be carried out."

## II.

As we said, this case presents a single issue for resolution: May a guardian order that food and water be withheld from an incompetent ward who is in a persistent vegetative state but who is otherwise alive within the meaning of Section 194.005, RSMo 1986, and not terminally ill? As the parties carefully pointed out in their thoughtful briefs, this issue is a broad one, invoking consideration of the authority of guardians of incompetent wards, the public policy of Missouri with regard to the termination of life-sustaining treatment and the amorphous mass of constitutional rights generally described as the "right to liberty", "the right to privacy", equal protection and due process.

This is also a case in which euphemisms readily find their way to the fore, perhaps to soften the reality of what is really at stake. But this is not a case in which we are asked to let someone die. Nancy is not dead. Nor is she terminally ill. This is a case in which we are asked to allow the medical profession to make Nancy die by starvation and dehydration. The debate here is thus not between life and death; it is between quality of life and death. We are asked to hold that the cost of maintaining Nancy's present life is too great when weighed against the benefit that life con-

veys both to Nancy and her loved ones and that she must die.

To be sure, no one carries a malevolent motive to this litigation. Only the coldest heart could fail to feel the anguish of these parents who have suffered terribly these many years. They have exhausted any wellspring of hope which might have earlier accompanied their now interminable bedside vigil. And we understand, for these loving parents have seen only defeat through the memories they hold of a vibrant woman for whom the future held but promise.

Finally, we are asked to decide this case as a court of law. Neither this, nor any court lays proper claim to omniscience. We share the limits borne by all as human beings, only too aware of our earthbound perspective and frustrated by what we cannot now know. Our role is a limited one to which we remain true only if our decision is firmly founded on legal principles and reasoned analysis. And we must remember that we decide this case not only for Nancy, but for many, many others who may not be surrounded by the loving family with which she is blessed.

## A.

While this is a case of first impression in Missouri, the courts of some of our sister states have grappled with similar issues.[4]

---

**4.** The following is a list of state court cases since 1976 addressing the initiation or removal of life-sustaining treatment: ARIZONA: *Rasmussen v. Fleming,* 154 Ariz. 207, 741 P.2d 674 (1987); CALIFORNIA: *Barber v. Super. Ct. of State of Cal.,* 147 Cal.App.3d 1006, 195 Cal.Rptr. 484 (1983), *Dority v. Super. Ct. of San Bernadino County,* 145 Cal.App.3d 273, 193 Cal.Rptr. 288 (1983), *Bartling v. Glendale Adventist Medical Center,* 184 Cal.App.3d 961, 229 Cal.Rptr. 360 (1986), *Bouvia v. Super Ct. of Los Angeles,* 179 Cal.App.3d 1127, 225 Cal.Rptr. 297 (1986), *In re Drabick III,* 200 Cal.App.3d 185, 245 Cal.Rptr. 840 (1988); COLORADO: *Trujillo v. Dist. Ct. in & for Tenth Judicial Dist.,* 198 Colo. 419, 601 P.2d 1072 (1979); CONNECTICUT: *Foody v. Manchester Memorial Hospital,* 40 Conn.Supp. 127, 482 A.2d 713 (1984); DELAWARE: *Severns v. Wilmington Medical Center,* 425 A.2d 156 (Del.Ch.1980); FLORIDA: *Satz v. Perlmutter,* 362 So.2d 160 (Fla.Dist.Ct.App.1978); *In re Guardianship of Barry,* 445 So.2d 365 (Fla.Dist. Ct.App.1984); *John F. Kennedy Memorial Hospital v. Bludworth,* 452 So.2d 921 (Fla.1984), *Corbett v. D'Alessandro,* 487 So.2d 368 (Fla.Dist.Ct. App.1986), *Wons v. Public Health Trust of Dade County,* 500 So.2d 679 (Fla.Dist.Ct.App.1987); GEORGIA: *In re L.H.R.,* 253 Ga. 439, 321 S.E.2d 716 (1984); IOWA: *Morgan v. Olds,* 417 N.W.2d 232 (Iowa App.1987); LOUISIANA: *In re PVW,* 424 So.2d 1015 (La.1982); MAINE: *In re Joseph v. Gardner,* 534 A.2d 947 (Me.1987); MASSACHUSETTS: *Superintendent of Belchertown State School v. Saikewicz,* 373 Mass. 728, 370 N.E.2d 417 (1977), *In re Dinnerstein,* 6 Mass. App.Ct. 466, 380 N.E.2d 134 (1978), *In re Spring,* 380 Mass. 629, 405 N.E.2d 115 (1980), *Custody of a Minor,* 385 Mass. 697, 434 N.E.2d 601 (1982), *In the matter of Hier,* 18 Mass.App.Ct. 200, 464 N.E.2d 959 (1984), *Brophy v. New England Sinai Hosp.,* 398 Mass. 417, 497 N.E.2d 626 (1986); MINNESOTA: *In the matter of Torres,* 357 N.W.2d 332 (Minn.1986); NEW JERSEY: *In the matter of Quinlan,* 70 N.J. 10, 355 A.2d 647

Nearly unanimously, those courts have found a way to allow persons wishing to die, or those who seek the death of a ward, to meet the end sought.[5]

The seminal case is *In re Quinlan,* 70 N.J. 10, 355 A.2d 647 (1976), *cert. denied,* 429 U.S. 922, 97 S.Ct. 319, 50 L.Ed.2d 289 (1976). Karen Quinlan suffered severe brain damage as a result of anoxia. Medical experts diagnosed her as terminally ill and in a persistent vegetative state. A respirator assisted her breathing; a feeding tube provided her nourishment. The experts believed that she could not survive without the respirator. The trial court found that there was no reasonable possibility that she would return to a cognitive or sapient life.

Karen's father sought judicial permission to disconnect the respirator, believing that death would follow quickly;[6] the expert medical testimony so advised him.[7] The New Jersey Supreme Court found a right of privacy in Karen to terminate her life under this "non-cognitive, vegetative existence". In striking a balance between Karen's right of privacy and the state's interest in life, the court said:

> We think that the State's interest *contra* weakens and the individual's right to privacy grows as the degree of bodily invasion increases and the prognosis dims. Ultimately there comes a point at which the individual's rights overcome the State interest.

355 A.2d at 664. In light of Karen's inability to exercise the right herself the court wrote:

> The only practical way to prevent destruction of the right is to permit the guardian and family of Karen to render their best judgment ... as to whether she would exercise it in these circumstances. [W]e determine that Karen's right of privacy may be asserted in her behalf, in this respect, by her guardian and family under the particular circumstances presented by this record.

*Id.*

*Superintendent of Belchertown State School v. Saikewicz,* 373 Mass. 728, 370

(1976), *In the Matter of Conroy,* 98 N.J. 321, 486 A.2d 1209 (1985), *Iafelice v. Luchs,* 206 N.J.Super. 103, 501 A.2d 1040 (1985), *In the Matter of Clark,* 210 N.J.Super. 548, 510 A.2d 136 (Ch.Div. 1986), *In the Matter of Requena,* 213 N.J.Super. 475, 517 A.2d 886 (Ch.Div.1986), *In the Matter of Visbeck,* 210 N.J.Super. 527, 510 A.2d 125 (Ch. Div.1986), *In the Matter of Farrell,* 108 N.J. 335, 529 A.2d 404 (1987), *In the Matter of Jobes,* 108 N.J. 394, 529 A.2d 434 (1987), *In the Matter of Peter,* 108 N.J. 365, 529 A.2d 419 (1987); NEW YORK: *In the Matter of Eichner,* 102 Misc.2d 184, 423 N.Y.S.2d 580 (N.Y.Sup.Ct.1979), *In the Matter of Storar,* 52 N.Y.2d 363, 420 N.E.2d 64, 438 N.Y.S.2d 266 (1981), *In the Matter of Lydia E. Hall Hospital v. Cinque,* 116 Misc.2d 477, 455 N.Y.S.2d 706 (N.Y.Sup.Ct.1982), *A.B. v. C.,* 124 Misc.2d 672, 477 N.Y.S.2d 281 (N.Y.Sup.Ct. 1984), *Crouse Irving Memorial Hospital v. Paddock,* 127 Misc.2d 101, 485 N.Y.S.2d 443 (N.Y. Sup.Ct.1985), *In the Matter of Saunders,* 129 Misc.2d 45, 492 N.Y.S.2d 510 (N.Y.Sup.Ct.1985), *In the Matter of Delio,* 134 Misc.2d 206, 510 N.Y.S.2d 415 (N.Y.Sup.Ct.1986), *In re Harvey "U",* 116 A.D.2d 351, 501 N.Y.S.2d 920 (N.Y.App. Div.1986), *In the Matter of O'Brien,* 135 Misc.2d 1076, 517 N.Y.S.2d 346 (N.Y.Sup.Ct.1986), *Vogel v. Forman,* 134 Misc.2d 395, 512 N.Y.S.2d 622 (N.Y.Sup.Ct.1986), *In the Matter of Fink,* 135 Misc.2d 270, 514 N.Y.S.2d 893 (N.Y.Sup.Ct. 1987), *In the Matter of Weinstein,* 136 Misc.2d 931, 519 N.Y.S.2d 511 (N.Y.Sup.Ct.1987); OHIO: *Leach v. Akron General Medical Center,* 68 Ohio

Misc. 1, 426 N.E.2d 809 (1980), *In re Milton,* 29 Ohio St.3d 20, 505 N.E.2d 255 (1987); PENNSYLVANIA: *In re Estate of Dorone,* 349 Pa.Super. 59, 502 A.2d 1271 (1985); WASHINGTON: *In the Matter of Colyer,* 99 Wash.2d 114, 660 P.2d 738 (1983), *Dinino v. State of Washington,* 102 Wash.2d 327, 684 P.2d 1297 (1984), *In the Matter of Hamlin,* 102 Wash.2d 810, 689 P.2d 1372 (1984), *In the Matter of Ingram,* 102 Wash. 2d 827, 689 P.2d 1363 (1984), *In re Guardianship of Grant,* 109 Wash.2d 545, 747 P.2d 445 (1987).

5. The dissenters adopt a "me too" posture without burdening themselves with any analysis of the legal reasoning upon which *Quinlan* and cases following it rely. The dissenters work backwards, choosing a result then creating reasons to "support" it. It is our duty in a case of first impression in this state not only to consider precedents from other states, but also to determine their strength. We have found them wanting and refuse to eat "on the insane root which takes the reason prisoner." *Shakespeare, MacBeth,* I, iii.

6. Karen Quinlan lived nine years after the respirator was disconnected.

7. When asked if he wanted Karen's nasogastric feeding tube removed, Mr. Quinlan replied, "Oh no, that is her nourishment." Ramsey, "Prolonged Dying: Not Medically Indicated," 6 Hastings Cent.Rep. 14 (1976).

N.E.2d 417 (1977), involved a mentally retarded resident of a state school suffering from acute myeloblastic monocytic leukemia, in need of chemotherapy, but incapable of giving informed consent for the treatment. The court recognized a general right to refuse medical treatment in appropriate circumstances and held that such a right extends to incompetents. Given Saikewicz' lifetime incompetency, the court adopted a substituted judgment standard for determining whether Saikewicz, if competent, would have elected to undergo chemotherapy. While recognizing that most persons in a similar situation would choose to lengthen their life through the treatments available, the court found that Saikewicz' inability to cooperate with the treatment and inability to understand the disruption in his routine, particularly the severe side effects produced by the drugs, rendered it likely that if Saikewicz could, he would decide against the treatment.

The court found a constitutional basis for the refusal-of-treatment decision, but eschewed the cognitive, sapient, quality of life considerations found in *Quinlan*. "To the extent that [quality of life even if treatment can bring about remission] equates the value of life with any measure of the quality of life, we firmly reject it." 370 N.E.2d at 432. Instead, the Massachusetts court found the extraordinary nature of the treatment presented a sufficiently massive invasion of a person's privacy to warrant a decision against undergoing treatment.

In 1981, the New York Court of Appeals advanced a different theoretical approach to refusal-of-treatment decisions. In *In re Storar* and *In re Eichner*, 52 N.Y.2d 363, 420 N.E.2d 64, 438 N.Y.S.2d 266 (1981), the court found the common law right to refuse treatment sufficient to warrant termination of treatment (*Eichner*) and rejected the substituted judgment analysis in matters relating to persons who experienced lifetime incompetency (*Storar*). The court found a discussion of constitutional rights unnecessary to its decisions.

In *Eichner*, Brother Joseph Fox, a member of the Society of Mary, suffered cardiac arrest during an operation. Oxygen depletion resulted in severe brain damage; Fox lost the ability to breathe without a respirator. In "formal" discussions consistent with his role as a teacher in a Catholic high school and a mission of promulgating Catholic moral principles, Fox discussed the Karen Quinlan care and stated that he wanted nothing extraordinary done to keep him alive. The court found his common law right to refuse treatment controlling under the circumstances, given the solemn and "formal" nature of Fox' expressed desire to forego extraordinary medical treatment.

John Storar was a profoundly retarded 52-year-old suffering from metastatic cancer. His life expectancy was three to six months. He continually lost blood, requiring blood transfusions of two units every eight to fifteen days. Without the transfusions, medical experts believed Storar would bleed to death. His mother asked that the transfusions be stopped. Testimony at trial characterized the transfusions as "analogous to food—they would not cure the cancer, but would eliminate the risk of death from another treatable cause." 438 N.Y.S.2d at 275, 420 N.E.2d at 73.

The court recognized that Storar never possessed sufficient mental competency to render a decision as to extraordinary life sustaining procedures. Departing from the analysis in *Saikewicz*, the New York Court of Appeals found it "unrealistic to attempt to determine whether he would want to continue potentially life prolonging treatment if he were competent." 438 N.Y.S. at 275, 420 N.E.2d at 72. Instead, the court reasoned that Storar's condition was no different from that of any infant. A court would not allow a parent to deny a child all treatment for a condition which threatens his life; a parent's refusal to allow blood transfusions in the face of an infant bleeding to death presents a "classic" example of the court's power to order treatment in the face of parental refusal. Storar's blood transfusions could not be terminated.

*Quinlan*, *Saikewicz*, and *Eichner/Storar* provide the legal basis for all

of the cases which followed. These three cases limit themselves to circumstances in which the patient is terminally ill. Cases which follow, however, recognize no such restraint, but extend the principles upon which the *Quinlan–Saikewicz–Eichner/ Storar* trilogy rely, to persons who are not terminally ill.

*In re Conroy,* 98 N.J. 321, 486 A.2d 1209 (1985), attempted to determine the circumstances under which "life-sustaining treatment may be withheld or withdrawn from incompetent, institutionalized, elderly patients with severe and permanent mental and physical impairments and a limited life expectancy."[8] 486 A.2d at 1216. Specifically, 84–year–old Claire Conroy's guardian sought to remove a nasogastric feeding tube by which she received her nutrition.

The court formulated three tests to assist in making a determination as to the withdrawal of life-sustaining procedures. These tests are arguably the only ones adopted by a court which adequately consider the state's interest in life in the context of life-sustaining treatment. First, when clear and convincing evidence exists that an incompetent patient would refuse treatment under the circumstances were he able to do so, the guardian may exercise a substituted judgment to achieve that end. This is denominated the subjective test.

A second test, designated the limited objective test, is applied in the absence of clear and convincing evidence of the patient's wishes, but where there is a measure of trustworthy evidence that the patient would have refused the treatment. Noting that "it is naive to pretend that the right to self-determination serves as the basis for substituted decision making...." 486 A.2d at 1231, the court went on to permit the termination of life support "if it is manifest that such action would further the patient's best interests...." *Id.* Thus, where it is clear that the burden of the patient's unavoidable pain and suffering outweighs the benefits of continued life, termination could follow.

A third test, characterized as the pure objective test, is operable where there is no evidence of the patient's desires as to life sustaining treatment. Where the "effect of administering life-sustaining treatment would be inhumane" due to severe, recurring and unavoidable pain, treatment may be terminated. 486 A.2d at 1232.

Ms. Conroy never expressed an opinion as to life-sustaining treatments, nor did the medical evidence show that feeding by the nasogastric tube was particularly painful. Since Ms. Conroy did not meet any of the three tests, the court would have refused to permit the withdrawal of the feeding tube.[9]

*Brophy v. New England Sinai Hospital, Inc.,* 398 Mass. 417, 497 N.E.2d 626 (1986), went beyond *Conroy* on facts similar to Nancy's case. Paul Brophy suffered a ruptured aneurysm and due to oxygen deprivation to the brain, entered a persistent vegetative state. The trial court found that Brophy was neither dead, terminally ill, nor in danger of imminent death. His heart functioned without mechanical assistance as did his respiratory system. A gastrostomy tube provided food and water.

The court found that if Brophy were able to do so, he would decide to discontinue the feeding tube. While recognizing that the state's interest in life must be considered, the court reasoned that the state's interest could not overcome Brophy's right to discontinue treatment. The court allowed Brophy's guardian to exercise his substituted judgment to terminate feeding.

At about the time the Supreme Judicial Court of Massachusetts considered *Brophy,* the California Court of Appeals decided *Bouvia v. Superior Court,* 179 Cal. App.3d 1127, 225 Cal.Rptr. 297 (1986). There a 28–year–old, quadriplegic woman afflicted with severe cerebral palsy sought removal of the nasogastric tube by which she was fed. The court characterized her

---

**8.** The court intended to apply its tests only in circumstances in which the patient had a life expectancy of no more than one year. 486 A.2d at 1231.

**9.** Ms. Conroy died during the pendency of the litigation.

as "intelligent, very mentally competent." 225 Cal.Rptr. at 300. Finding it "immaterial that the removal of the nasogastric tube will hasten or cause Bouvia's eventual death," 225 Cal.Rptr. at 305, the court held that Bouvia's right to live her life in dignity and peace outweighed the state's interest in preserving life and preventing suicide.

*In re Jobes*, 108 N.J. 394, 529 A.2d 434 (1987), presents facts similar to this case. Nancy Jobes was pregnant and in excellent health. Following an automobile accident and during surgery to remove the child killed in her womb in the accident, she lost oxygen flow to her brain. Irreversible brain damage followed; she needed assistance breathing and received nourishment through a tube inserted into the jejunum of her small intestine. Her husband sought permission to remove her feeding tube.

The tests established by this same court in *Conroy* were not applicable. The court found that Mrs. Jobes' previous statements about refusing life support under conditions like Karen Quinlan's were

> remote, general, spontaneous, and made in casual circumstances. Indeed, they closely track the examples of evidence that we have explicitly characterized as unreliable. *See Conroy* ... 486 A.2d at 1238 (negating probative value of 'an offhand remark about not wanting to live under certain circumstances made by a person when young and in the peak of health'). ...

529 A.2d at 443.

Instead of relying on *Conroy*, the court determined that cases involving persistently vegetative patients required a return to *Quinlan*. Assuming again that a persistently vegetative patient would choose to have all life support terminated if able, the court determined that Ms. Jobes' family could make the determination to remove her life support. Given the court's reasoning, one must assume that the family's right to make that decision is unbridled given the patient's inability to voice objection.[10] Again, the court was able to discount entirely the state's interest in the preservation of life, finding it "difficult to conceive of a case in which the State could have an interest strong enough to subordinate a *patient's right to choose* not to be sustained in a persistent vegetative state" 529 A.2d at 444, *quoting In re Peter*, 108 N.J. 365, 529 A.2d 419, 427 (1987) (emphasis added).

Against this background, we turn to consider the arguments of the parties in the case at hand.

### III.

On the dispositive point, the State argues that the trial court erred in "holding that a refusal to allow withdrawal of nutrition and hydration under the facts of this case would deny Nancy Cruzan's 'right to liberty' and that to deny the coguardians the authority to act on her behalf would deprive her of equal protection of the laws." Respondents support the trial court's order by urging that Nancy has both a common law and constitutional right to be free from "invasive, unwanted and nonbeneficial" medical treatment, and that her right to refuse such treatment survives incompetency and may be exercised by her guardians as substituted decisionmakers.

### A. The Right to Refuse Treatment

The common law recognizes the right of individual autonomy over decisions relating to one's health and welfare.[11] From this

---

**10.** This conclusion is troublesome, given the court's rejection of the patient's statements regarding life support as inherently unreliable. One wonders if contrary statements would be similarly unreliable and leave the decision entirely in the hands of a guardian.

**11.** "The right of self-determination and individual autonomy has its roots deep in our history." *Brophy*, 497 N.E.2d at 633. At this point, courts regularly turn to J.S. Mill for inspiration. "[T]he only purpose for which power can be rightfully exercised over any member of a civilized community, against his will, is to prevent harm to others. His own good, either physical or moral, is not a sufficient warrant. He cannot rightfully be compelled to do or to forebear because it will be better for him to do so, because it will make him happier, because, in the opinion of others, to do so would be wise, or even right." Mill, *On Liberty*, in 43 Great Books of the Western World 271 (R. Hutchins ed. 1952). Aside from citing Mill for the proposition announced, courts seldom indulge the

root of autonomy, the common law developed the principle that a battery occurs when a physician performs a medical procedure without valid consent. *Hershley v. Brown*, 655 S.W.2d 671, 676 (Mo.App.1983). The doctrine of informed consent arose in recognition of the value society places on a person's autonomy and as the primary vehicle by which a person can protect the integrity of his body. If one can consent to treatment, one can also refuse it. Thus, as a necessary corollary to informed consent, the right to refuse treatment arose. "The patient's ability to control his bodily integrity ... is significant only when one recognizes that this right also encompasses a right to informed refusal." *Conroy*, 486 A.2d at 1222.

■ A decision as to medical treatment must be informed.

There are three basic prerequisites for informed consent: the patient must have the capacity to reason and make judgments, the decision must be made voluntarily and without coercion, and the patient must have a clear understanding of the risks and benefits of the proposed treatment alternatives or nontreatment, along with a full understanding of the nature of the disease and the prognosis. Wanzer, Adelstein, Cranford, Federman, Hook, Moertel, Safar, Stone, Taussig & Van Eys, "The Physician's Responsibility Toward Hopelessly Ill Patients," 310 New Eng. J. Med., 955, 957 (1984). In the absence of these three elements, neither consent nor refusal can be informed. Thus, it is definitionally impossible for a person to make an informed decision—either to consent or to refuse—under hypothetical circumstances; under such circumstances, neither the benefits nor the risks of treatment can be properly weighed or fully appreciated.

## B. The Right to Privacy

*Quinlan*, and cases which follow it, announce that a patient's right to refuse medical treatment also arises from a constitutional right of privacy. Although some courts find that right embedded in their state constitutions[12], the privacy argument is most often founded on decisions of the United States Supreme Court, primarily *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). Unfortunately, the bare statement that the right of privacy extends to treatment decisions is seldom accompanied by any reasoned analysis as to the scope of that right or its application to the refusal of life-sustaining treatment.

■ Neither the federal nor the Missouri constitutions expressly provide a right of privacy. In *State v. Walsh*, 713 S.W.2d 508, 513 (Mo. banc 1986), this Court was asked to recognize an unfettered right of privacy. We declined to do so.[13] This is consistent with our view that Missouri's constitution must be interpreted according to its plain language and in a manner consistent with the understanding of the people who adopted it. *State ex rel. Danforth v. Cason*, 507 S.W.2d 405, 408–09 (Mo. banc 1973). We thus find no unfettered right of privacy under our constitution that would support the right of a person to refuse medical treatment in every circumstance.

temptation to determine whether one person's autonomy and self-determination can be exercised by another, though the very terms seem to indicate that these rights are not alienable, unless so determined by the person for whom they are exercised.

**12.** At least five state courts which authorized the refusal of life-sustaining treatment found a right of privacy expressly provided in their state constitutions. *See, e.g., Bouvia v. Superior Court,* 179 Cal.App.3d 1127, 225 Cal.Rptr. 297 (1986); *In re Guardianship of Barry,* 445 So.2d 365 (Fla. Dist.Ct.App.1984) (noting state constitution was amended after *Satz v. Perlmutter,* 362 So.2d 160 (Fla.Dist.Ct.App.1978) to recognize a right to privacy in medical treatment decisions); *Matter of Quinlan,* 70 N.J. 10, 355 A.2d 647 (1976); *Matter of Welfare of Colyer,* 99 Wash.2d 114, 660 P.2d 738 (1983); *Rasmussen by Mitchell v. Fleming,* 154 Ariz. 207, 741 P.2d 674 (1987).

**13.** In *Barber v. Time, Inc.,* 348 Mo. 1199, 1205–06, 159 S.W.2d 291, 294 (1942), this Court stated that a right of privacy may grow out of a constitutional right. The *Barber* decision provides protection against the publication of private facts and springs from the well-known tort of invasion of privacy. We find its discussion inapplicable in cases involving decisions of personal autonomy.

If Nancy possesses such a right, it must be found to derive from the federal constitutional right to privacy announced by the United States Supreme Court. That Court "has recognized that a right of personal privacy, or a guarantee of certain areas or zones of privacy, does exist under the [United States] Constitution." *Roe v. Wade*, 410 U.S. at 152, 93 S.Ct. at 726. The Supreme Court has not, however, extended the right of privacy to permit a patient or her guardian to direct the withdrawal of food and water. We are left to determine for ourselves whether the penumbral right of privacy encompasses a right to refuse life-sustaining medical treatment.

*Quinlan* is the first case to apply a right of privacy to decisions regarding the termination of life-sustaining treatment. In deciding the applicability of the right to such determinations, *Quinlan* first cites *Griswold v. Connecticut*, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965), for the proposition that the right of privacy exists and, without further analysis states: "Presumably this right is broad enough to encompass a patient's decision to decline medical treatment under certain circumstances, in much the same way as it is broad enough to encompass a woman's decision to terminate a pregnancy under certain conditions." 355 A.2d at 663, *citing Roe v. Wade*. The presumption invoked by the New Jersey Supreme Court provides the precedent for the extension of this right of privacy by other courts whose decisions permitting the termination of life sustaining treatment is founded on privacy.

Yet *Roe* itself counsels against such a broad reading.

The privacy right involved, therefore, cannot be said to be absolute. In fact, it is not clear to us that the claim asserted by some amici that one has an unlimited right to do with one's body as one pleases bears a close relationship to the right of privacy previously articulated in the Court's decisions. The Court has re-fused to recognize an unlimited right of this kind in the past.

*Roe*, 410 U.S. at 154, 93 S.Ct. at 727.

The language in *Roe* is not an aberration. The Supreme Court's most recent privacy decision resisted expansion of the privacy right. In *Bowers v. Hardwick*, 478 U.S. 186, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986), the Supreme Court considered whether the right to privacy extended to the conduct of homosexuals. Noting that the prior right to privacy cases focused on a common theme of procreation and relationships within the bonds of marriage, the court refused to extend the right of privacy beyond those bounds, arguing that such an extension amounted to the discovery of a new right.

Nor are we inclined to take a more expansive view of our authority to discover new fundamental rights imbedded in the Due Process Clause. The Court is most vulnerable and comes nearest to illegitimacy when it deals with judge-made constitutional law having little or no cognizable roots in the language or design of the Constitution.... There should be, therefore, great resistance to expand the substantive reach of those clauses, *particularly if it requires redefining the category of rights deemed to be fundamental.* Otherwise, the Judiciary necessarily takes to itself further authority to govern the country without express constitutional authority.

*Bowers*, 478 U.S. at 194–95, 106 S.Ct. at 2846 (emphasis added).

Based on our anaylsis of the right to privacy decisions of the Supreme Court, we carry grave doubts as to the applicability of privacy rights to decisions to terminate the provision of food and water to an incompetent patient.[14] As will be seen, however, even if we recognize such a broadly sweeping right of privacy, a decision by Nancy's co-guardians to withdraw food and water under these circumstances cannot be sustained.

---

**14.** This is not a matter of forfeiture of a constitutional right because that term implies some state action which deliberately removes or limits a constitutional right.

### C. The State's Interests

#### 1.

■ Neither the right to refuse treatment nor the right to privacy are absolute; each must be balanced against the State's interests to the contrary. Four state interests have been identified: preservation of life, prevention of homicide and suicide, the protection of interests of innocent third parties and the maintenance of the ethical integrity of the medical profession. *See* Section 459.055(1), RSMo 1986; *Brophy*, 497 N.E.2d at 634. In this case, only the state's interest in the preservation of life is implicated.

■ The state's interest in life embraces two separate concerns: an interest in the prolongation of the life of the individual patient and an interest in the sanctity of life itself. As to the former,

> The concern for preservation of the life of the patient normally involves an *interest in the prolongation of life.* Thus, the State's interest in preserving life is very high when "human life [can] be saved where the affliction is curable." *Saikewicz*, ... 370 N.E.2d at 425–426. That interest wanes when the underlying affliction is incurable and "would soon cause death regardless of any medical treatment." *Commissioner of Corrections v. Myers*, [379 Mass. 255] 399 N.E. 2d 452, 456 (Mass.1979). *Saikewicz, supra.* The calculus shifts when the issue is not "whether, but when, for how long, and at what cost to the individual that life may be *briefly* extended." *Id.* [370 N.E.2d] at 426.

*Brophy*, 497 N.E.2d at 635 (emphasis added).

The state's interest in prolonging life is particularly valid in Nancy's case. Nancy is not terminally ill. Her death is imminent only if she is denied food and water. Medical evidence shows Nancy will continue a life of relatively normal duration if allowed basic sustenance.

The state's concern with the sanctity of life rests on the principle that life is precious and worthy of preservation without regard to its quality. This latter concern is especially important when considering a person who has lost the ability to direct her medical treatment. In such a circumstance, we must tread carefully, with due regard for those incompetent persons whose wishes are unknowable but who would, if able, choose to continue life-sustaining treatment. Any substantive principle of law which we adopt must also provide shelter for those who would choose to live—if able to choose—despite the inconvenience that choice might cause others.

At the beginning of life, Missouri adopts a strong predisposition in favor of preserving life. Section 188.010, RSMo 1986, announces the "intention of the General Assembly of Missouri to grant the right to life to all humans, born and unborn...." Section 188.015(7), RSMo 1986, determines that a fetus is viable "when the life of the unborn child may be continued indefinitely outside the womb by natural or *artificial lifesupport systems*" (emphasis added). Section 188.130, RSMo 1986, denies a cause of action for wrongful life and wrongful birth.

At the end of life, this State maintains its policy strongly favoring life. In response to the dilemmas which attend the increasing ability of medical science to maintain life where death would have come quickly in former days, legislatures across the country adopted so-called "Living Will" statutes. These permit a competent person to decree in a formal document that she would refuse death prolonging medical treatment in the event of terminal illness and an accompanying inability to refuse such treatment as a result of incompetency.

The Uniform Rights of the Terminally Ill Act (URITA) provided the basis for many of these acts. Missouri's statute, Sections 459.010, *et seq.*, RSMo 1986, is modeled after URITA, but with substantial modifications which reflect this State's strong interest in life.

URITA defines "life-sustaining treatment" as "any medical procedure or intervention that, when administered to a qualified patient, will serve only to prolong the dying process." URITA § 1(4). Missouri

chose to call such treatment a "death-pro-longing procedure" which is defined as

> any medical procedure or intervention which, when applied to a patient, would serve only to prolong artificially the dying process and where, in the judgment of the attending physician pursuant to usual and customary medical standards, death will occur within a short time whether or not such procedure is utilized. *Death-prolonging procedure shall not include* the administration of medication or the performance of medical procedure deemed necessary to provide comfort care or to alleviate pain nor *the performance of any procedure to provide nutrition or hydration.*

Section 459.010(3), RSMo 1986 (emphasis added).

URITA defines a "terminal condition" as "an incurable or irreversible condition that, without the administration of life-sustaining treatment, will, in the opinion of the attending physician, result in death within a relatively short time." URITA, § 1(9). Section 459.010(6) defines a "terminal condition" as "an incurable or irreversible condition which ... is such that a death will occur within a short time regardless of the application of medical procedures."

Section 2 of URITA sets out the recommended form of the declaration as to the termination of life-sustaining treatment.[15] Our General Assembly adds, *inter alia,* the following statement to the recommended form: "It is not my intent to authorize affirmative or deliberate acts or omissions to shorten my life rather only to permit the natural process of dying." Section 459.-015.3, RSMo 1986. In a manner consistent with this provision, Section 459.055(5), RSMo 1986, plainly states: "Sections 459.-010 to 459.055 do not condone, authorize or approve mercy killing or euthanasia nor permit any affirmative or deliberate act or omission to shorten or end life."

None of the parties argue that Missouri's Living Will statute applies in this case. First, the law did not take effect until after Nancy's accident. Second, even if the law had been effective, Nancy had not executed a living will. The statute's import here is as an expression of the policy of this State with regard to the sanctity of life. We intend no judgment here as to whether the common law right to refuse medical treatment is broader than the Living Will statute. Beyond the broad policy statement it makes, that statute is not at issue in this case. The trial court erred in finding its provisions unconstitutional.

### 2.

It is tempting to equate the state's interest in the preservation of life with some measure of quality of life. As the discussion which follows shows, some courts find quality of life a convenient focus when justifying the termination of treatment. But the state's interest is not in quality of life. The broad policy statements of the legislature make no such distinction; nor shall we. Were quality of life at issue, persons with all manner of handicaps might find the state seeking to terminate their lives. Instead, the state's interest is in life; that interest is unqualified.

### D. Balancing the Patient's Rights and the State's Interest

#### 1.

In casting the balance between the patient's common law right to refuse treatment/constitutional right to privacy and the state's interest in life, we acknowledge that the great majority of courts allow the termination of life-sustaining treatment. In doing so, these courts invariably find that the patient's right to refuse treatment outweighs the state's interest in preserving life. In some cases, that result is the prod-

---

**15.** Section 2(b) of URITA reads:

> A declaration may, but need not, be in the following form:
> ### DECLARATION
> If I should have an incurable or irreversible condition that will cause my death within a relatively short time, and I am no longer able to make decisions regarding my medical treatment, I direct my attending physicians, pursuant to the Uniform Rights of the Terminally Ill Act of this State, to withhold or withdraw treatment that only prolongs the process of dying and is not necessary to my comfort or to alleviate pain.

uct of a hopeless medical prognosis; in others, the court allows concerns with quality of life to discount the state's interest in life. *Quinlan,* of course, is the source in each instance. Although *Quinlan* dealt with a terminally-ill person, it did so in language sufficiently broad that courts cite it for much different purposes.

On the one hand, *Quinlan* based its decision on Karen Quinlan's constitutional right to privacy. While recognizing that privacy rights must be balanced against the state's interest in life, the court found that Karen's treatment was so extraordinary and so invasive that the state's interest paled in comparison. Though unstated, one can properly assume from *Quinlan* that the state's interest might prevail were the patient undergoing ordinary medical treatment. This focus on the extraordinary/ordinary dichotomy provided a ready standard by which the patient's interest could be assessed in a constitutional sense against the state's interest in life.

Since *Quinlan,* the medical profession moved to abandon any distinction between extraordinary and ordinary treatment in considering the propriety of withdrawing life-sustaining treatment.[16] *Conroy,* decided by the same court six years later, found distinctions focusing on the type of treatment unpersuasive. "[W]hile the analysis may be useful in weighing the implications of the specific treatment for the patient, essentially it merely restates the question: whether the burdens of treatment so clearly outweigh its benefit to the patient that continued treatment would be inhumane." 486 A.2d at 1235.

This change of focus by the medical community led courts away from constitutional foundations for decisions in this area. "The erosion of distinctions based on treatment complicated constitutional analysis since there was no other readily apparent standard which courts could use to cali-

brate the burden of an individual's privacy right inflicted by particular kinds of treatment." Tribe, American Constitutional Law, 1365 (2d ed. 1988).

Perhaps realizing the difficulty of applying a constitutional standard which relied too heavily on medical technology, several courts, led by *Eichner,* abandoned right to privacy reasoning, focusing instead on the common law right to refuse treatment.

■ The common law right to refuse treatment is not absolute. It too must be balanced against the state's interest in life. From its early application in *Quinlan* and *Eichner,* both of which involved terminally-ill patients, courts have read the right in an everbroadening manner. *Brophy* led the way. There the court found that an incompetent patient's imputed desire to terminate treatment outweighed the state's interest despite the fact that the patient had a fairly long life expectancy if feeding continued. *Bouvia* and *In re Farrell,* 108 N.J. 335, 529 A.2d 404 (1987), took the next step; they found that the state's interest in preserving life is not compelling when a competent patient wishes to have life-sustaining treatment withdrawn.

No longer relying on the nature of the treatment to provide a standard, courts began to focus on the patient's medical prognosis and the individual patient's assessment of the quality of her life in the face of that prognosis. And in the face of a prognosis which promised no reasonable hope of recovery and which the patient found undesirable, the patient's choice prevailed over the state's interest.

. Commentators do not find this analysis persuasive. Taken to its logical end, this standard ultimately makes prognosis irrelevant. "This situation is conducive to a rhetorical justification of the cases—authorizing the patient's choice is merely allowing an inexorable dying process to contin-

---

**16.** The testimony in this case tends to confirm this trend. Dr. Ronald Cranford indicated that hydration and nutrition, however administered is medical treatment; for Cranford, the controlling factors are the patient's desires and those of her family. In cases like Nancy's "if you decided in terms of what the patient wanted or in terms of what the family wanted or the relationship between the two, to discontinue artificial feeding through the gastrostomy tube and then attempt to feed her through a syringe or spoon feeding would make no sense whatsoever in terms of the overall moral standard of decision making."

ue. While this distinction is rhetorically convenient, it is not easily justifiable by principle: where the patient's right to refuse medical treatment is constant, the patient's condition and prognosis would no longer seem to be relevant." Tribe, American Constitutional Law at 1366. Once prognosis becomes irrelevant, and the patient's choice always more important than the state's interest, this standard leads to the judicial approval of suicide. Tribe, *supra* at 1367.

This result can be obtained only if the state's interest in the preservation of life is substantially discounted. Yet courts manage to find the states' interests wanting and allow surrogates to choose the death of patients by invoking a nearly unbridled right to refuse treatment. For an explanation, we revert to *Quinlan.*

Prior to *Quinlan,* the common law preferred to err on the side of life. Choices for incompetents were made to preserve life, not hasten death.[17] *Quinlan* changed the calculus. Moving from the common law's prejudice in favor of life, *Quinlan* subtly recast the state's interest in life as an interest in the quality of life (cognitive and sapient), struck a balance between quality of life and Karen Quinlan's right to privacy and permitted the termination of a life sustaining procedure. By the rhetorical device of replacing a concern for life with quality of life, the court managed "to avoid affronting previously accepted norms" in reaching its decision. Alexander, "Death by Directive", 28 Santa Clara L.Rev 67, 82 (1988).

As we previously stated, however, the state's interest is not in quality of life. The state's interest is an unqualified interest in life. In striking the balance between a patient's right to refuse treatment or her right to privacy and the state's interest in life, we may not arbitrarily discount either

side of the equation to reach a result which we find desirable.

### 2.

### A.

We turn now to the facts of this case. Nancy's guardians invoke her common law right to refuse treatment and her constitutional right of privacy as bases for their decision to stop feeding Nancy. They claim that her prognosis is hopeless, that her treatment is invasive and that were she able, she would refuse the continuation of tubal feeding. We will consider each of these separately.

First, the evidence is clear and convincing that Nancy will never interact meaningfully with her environment again. She will remain in a persistent vegetative state until her death. She is totally dependent on others for her care. Respondents contend that the patient's interest must prevail when medical treatment "serves only to prolong a life inflicted with an incurable condition." *In re Colyer,* 99 Wash.2d 114, 660 P.2d 738, 743 (1983).

As we have said, a focus on prognosis as a basis for permitting the right-to-refuse treatment choice is problematic. Where the patient is not terminally ill, as here, the profoundly diminished capacity of the patient and the near certainty that that condition will not change leads inevitably to quality of life considerations. The argument made here, that Nancy will not recover, is but a thinly veiled statement that her life in its present form is not worth living. Yet a diminished quality of life does not support a decision to cause death.

Second, Nancy's counsel argues that her treatment is invasive. The invasion took place when the gastrostomy tube was inserted with consent at a time when hope remained for recovery. Presently, the tube merely provides a conduit for the introduc-

---

**17.** Missouri courts have ordered blood transfusions for infants and children over the religious objection of parents in order to preserve the child's life and health. *Morrison v. State,* 252 S.W.2d 97 (Mo.App.1952). *See also Jehovah's Witnesses v. King County Hosp.,* 278 F.Supp. 488 (W.D.Wash.1967), *aff'd,* 390 U.S. 598, 88 S.Ct. 1260, 20 L.Ed.2d 158 (1968); *In re Ivey,* 319 So.2d 53 (Fla.App.1975); *People v. Labrenz,* 411 Ill. 618, 104 N.E.2d 769 (1952); *State v. Perricone,* 37 N.J. 463, 181 A.2d 751, *cert. denied,* 371 U.S. 890, 83 S.Ct. 189, 9 L.Ed.2d 124 (1962); *In re Clark,* 21 Ohio Op.2d 86, 185 N.E.2d 128 (Ohio Comm.Pleas 1962); *Mitchell v. Davis,* 205 S.W.2d 812 (Tex.Civ.App.1947).

tion of food and water. The *continuation* of feeding through the tube is not heroically invasive.

This second argument requires us to assume that artificial hydration and nutrition are medical treatments. There is substantial disagreement on this point among physicians and ethicists.[18] Dr. Cranford so testified at trial. Arguments on each side are compelling.[19] The temptation here is to allow medical terminology to dictate legal principle. "Using medical explanations ... has utility for the courts. It removes the responsibility for decisions that seem harsh when explained in plainer language." Alexander, "Death by Directive", 28 Santa Clara L.Rev 67, 83 (1988). If the testimony at trial that Nancy would experience no pain even if she were allowed to die by starvation and dehydration is to be believed, it is difficult to argue with any conviction that feeding by a tube already in place constitutes a painful invasion for her. And common sense tells us that food and water do not treat an illness, they maintain a life.

The medical argument, if carried to its natural conclusion, takes us into a dangerous realm; it seems to say that treatment which does not cure can be withdrawn. But "[w]hen we permit ourselves to think that care is useless if it preserves the life of the embodied human being without restoring cognitive capacity, we fall victim to the old delusion that we have failed if we cannot *cure* and that there is, then, little point to continue *care*." Green, "Setting Boundaries for Artificial Feeding", The Hastings Center Report, December, 1984, 12, 13 (emphasis in original).

The issue is not whether the continued feeding and hydration of Nancy is medical treatment; it is whether feeding and providing liquid to Nancy is a burden *to her. Conroy.* We refuse to succumb to the semantic dilemma created by medical determinations of what is treatment; those distinctions often prove legally irrelevant. For the reasons stated, we do not believe the care provided by artificial hydration

**18.** AMA guidelines would permit withdrawal. Opinion 2.18 of the Current Opinions of the Council on Ethical and Judicial Affairs of the American Medical Association adopted in 1986 reads in pertinent part:

Even if death is not imminent but a patient's coma is beyond doubt irreversible and there are adequate safeguards to confirm the accuracy of the diagnosis and with the concurrence of those who have responsibility for the care of the patient, it is not unethical to discontinue all means of life-prolonging medical treatment.

Life-prolonging medical treatment includes medication and artificially or technologically supplied respiration, nutrition or hydration. In treating a terminally ill or irreversible comatose patient, the physician should determine whether the benefits of treatment outweigh its burdens. At all times, the dignity of the patient should be maintained.

In its amicus brief, the American Medical Association states that it is not unethical in certain circumstances for a physician to comply with the request of a patient or surrogate to withdraw life-prolonging medical treatment.

**19.** The other amicus curiae briefs filed in this case illustrate the split in thinking.

The American Academy of Neurology in its amicus brief states that Nancy is a "prisoner of medical technology" and that she and her family should be set free.

Concern for Dying urges that "decisions to apply, withhold or withdraw medical care and technology are a matter of personal, not medical, judgment, and that such decisions should be made in accordance with a patient's wishes, values and beliefs."

The Society for the Right to Die, Inc., avers that there is a "fundamental right to refuse life-sustaining treatment" and that "that right can be exercised on behalf of a permanently unconscious individual."

The Brief of the SSM Health Care System and the Center for Health Care Ethics, St. Louis University Medical Center states that "[w]ithin the Christian foundation, the withholding and withdrawing of medical treatment, including artificial nutrition and hydration, is acceptable."

The brief of the Association for Retarded Citizens of the United States and the Ethics and Advocacy Task Force of the Nursing Home Action Group, however, assert that a course such as that set out by the trial court would "threaten the affirmation and fundamental right to and interest in life of people with disabilities. It would subject them to radical and insidious discrimination based on their disabilities."

The brief of the Missouri Citizens for Life argues that neither the state nor federal constitution allows a competent person to starve or die of thirst and certainly no guardian can make that decision for an incompetent.

and nutrition is oppressively burdensome *to Nancy* in this case.

■ Third, the co-guardians argue that "Nancy's statements alone are enough to stop this artificial treatment." These statements are best summarized in the testimony of Nancy's roommate that she "would not want to continue her present existence without hope as it is." But "informally expressed reactions to other people's medical condition and treatment do not constitute clear proof of a patient's intent." *Jobes*, 529 A.2d at 443, *citing Conroy*, 486 A.2d at 1209.

■ Our earlier discussion about informed consent noted the requirements for consent or refusal to be truly informed. A decision to refuse treatment, when that decision will bring about death, should be as informed as a decision to accept treatment. If offered to show informed refusal, the evidence offered here "would be woefully inadequate. It is all the more inadequate to support a refusal that will result in certain death." *In re Gardner*, 534 A.2d 947, 957 (Clifford, J., dissenting.) As the court said in *Jobes*, "All of the statements about life-support that were attributed to Mrs. Jobes were remote, general, spontaneous, and made in casual circumstances. Indeed they closely track the examples of evidence that we have explicitly characterized as unreliable." *Jobes*, 529 A.2d at 443. Likewise, statements attributable to Nancy in this case are similarly unreliable for the purpose of determining her intent.

### B.

The state's relevant interest is in life, both its preservation and its sanctity. Nancy is not dead. Her life expectancy is thirty years.

Nancy's care requirements, while total, are not burdensome to Nancy. The evidence at trial showed that the care provided did not cause Nancy pain. Nor is that care particularly burdensome for her, given that she does not respond to it.

Finally, there is no evidence that Nancy is terminally ill. The quality of her life is severely diminished to be sure. Yet if food and water are supplied, she will not die.

■ Given the fact that Nancy is alive and that the burdens of her treatment are not excessive for her, we do not believe her right to refuse treatment, whether that right proceeds from a constitutional right of privacy or a common law right to refuse treatment, outweighs the immense, clear fact of life in which the state maintains a vital interest.

### E. Guardianship Issues

Nancy is incompetent; she cannot make informed choices concerning her medical treatment. We therefore do not decide any issue in this case relating to the authority of competent persons to suspend life-sustaining treatment in the face of terminal illness or otherwise. Our focus here is expressly limited to those instances in which the person receiving the life-sustaining treatment is unable to render a decision by reason of incompetency.

■ Section 475.120.3, RSMo 1986, provides that the guardian of an incapacitated ward shall provide for the ward's "care, treatment, habilitation, education, support and maintenance" and has the power to:

(2) Assure that the ward receives medical care and other services that are needed;

(3) Promote and protect the care, comfort, safety, health, and welfare of the ward;

(4) Provide required consents on behalf of the ward; ....

The statute makes no provision for the termination of medical treatment; to the contrary, it places an express, affirmative duty on guardians to assure that the ward receives medical care and provides the guardian with the power to give consent for that purpose. We thus find no statutory basis for the argument that the guardian possesses authority, as a guardian, to order the termination of medical treatment.

Assuming, *arguendo*, the guardian possesses such power, it must be derivative of the rights which the incompetent maintains as a person. Having found that such

rights do exist, *Quinlan* held, broadly and without precedential support, that the right of privacy and the right to refuse medical treatment may be exercised by surrogates in the event of incompetency. In this manner a rationale was born to reach the end sought.[20] Recall the language of *Quinlan:* "The only practical way to prevent destruction of the right is to permit the guardian and family of Karen to render their best judgment, subject to the qualifications[21] hereinafter stated, as to whether she would exercise it in these circumstances." 355 A.2d at 664.

As we said, these rights have been explained as rooted in personal autonomy and self-determination. Autonomy means self law—the ability to decide an issue without reference to or responsibility to any other. It is logically inconsistent to claim that rights which are found lurking in the shadow of the Bill of Rights and which spring from concerns for personal autonomy can be exercised by another absent the most rigid of formalities.

Given the fact that these patients are irreversibly comatose or in a chronic vegetative state, attributing "rights" to these patients at all is somewhat problematic.... To be sure, these patients are not "dead" in most of the increasingly multiple senses of the term, but the task of giving content to the notion that they have rights, in the face of the recognition that they could make no decisions about how to exercise any such rights, remains a difficult one.

Tribe, American Constitutional Law, at 1368, n. 25. In discussing the constitutional right of privacy, the United States Supreme Court wrote that the right of privacy, when exercised in an abortion context, is one that cannot be vetoed by any third party.

[T]he State does not have the constitutional authority to give a third party an absolute, and possibly arbitrary, veto over the decision of the physician and his patient.... Any independent interest the parent may have in the termination of the minor daughter's pregnancy is no more weighty than the right of privacy of the competent minor mature enough to have become pregnant.

*Planned Parenthood of Central Missouri v. Danforth,* 428 U.S. 52, 74, 75, 96 S.Ct. 2831, 2843, 2844, 49 L.Ed.2d 788 (1975).

Assuming, *arguendo,* that the right of privacy may be exercised by a third party in the absence of strict formalities assigning that right, the risk of arbitrary decisionmaking and grave consequences attaches all the more when the third party seeks to cause the death of an incompetent. Just as the State may not delegate to any person the right to veto another's right to privacy choices, no person can assume that choice for an incompetent in the absence of the formalities required under Missouri's Living Will statutes or the clear and convincing, inherently reliable evidence absent here.

■ Nor do we believe that the common law right to refuse treatment—founded in personal autonomy—is exercisable by a third party absent formalities. A guardian's power to exercise third party choice arises from the state's authority, not the constitutional rights of the ward. The guardian is the delegatee of the state's *parens patriae* power. *In re Link,* 713 S.W.2d 487, 493 (Mo. banc 1986).

Cases which relied on the doctrine of substituted judgment to permit guardians to choose termination of life support simply failed to consider the source of the guardian's authority to decide. Instead those decisions assumed, without benefit of legal

---

**20.** *Saikewicz* adopts substituted judgment to a remarkable end. Substituted judgment in that case permits the decisionmaker to assume that he is an incompetent who becomes competent but continues to weigh the decision as though incompetent.

**21.** "The 'qualification' that the [court] alluded to was the notion of preserving a 'cognitive, sapi-

ent life.' ... In other words, the reduced prospects of what the court called a 'cognitive' and 'sapient' life would be taken as *prima facie* grounds for the inference that the patient would not wish to preserve her life." Arkes, " 'Autonomy' and the 'Quality of Life': The Dismantling of Moral Terms," Issues in Law & Medicine, Vol. 2, No. 6, 421, 428 (1987).

precedent, that the guardian's power to decide is derivative of the incompetent's right to decide, if competent. *See Quinlan,* 355 A.2d at 664. That the doctrine has an historical antecedent, *Saikewicz,* 370 N.E.2d at 431, does not change its *raison d'etre* or the scope of its reach. To fail to appreciate the legal foundation is to risk permitting the application of the doctrine in an unprincipled manner.

As applied in right-to-terminate-treatment decisions, the doctrine of substituted judgment is applied in abrogation of the state's *parens patriae* power, not in furtherance of it. In cases like this one, the doctrine authorizes a guardian to cause the death of a ward unilaterally, without interference by the state, and contrary to the state's vital interests in preserving life and in assuring the safekeeping of those who cannot care for themselves.

As one commentary warns:

[T]hird party consent allows the truly involuntary to be declared voluntary, thus bypassing constitutional, ethical and moral questions, and avoiding the violation of taboos. Third party consent is a miraculous creation of the law—adroit, flexible, and useful in covering the unseemly reality of conflict with the patina of cooperation.

Price and Burt, "Sterilization, State Action, and the Concept of Consent," Law and Psychology Review, p. 58 (Spring 1975).

### IV.

In sum, we hold that the co-guardians do not have authority to order the withdrawal of hydration and nutrition to Nancy. We further hold that the evidence offered at trial as to Nancy's wishes is inherently unreliable and thus insufficient to support the co-guardians claim to exercise substituted judgment on Nancy's behalf. The burden of continuing the provision of food and water, while emotionally substantial for Nancy's loved ones, is not substantial for Nancy. The State's interest is in the preservation of life, not only Nancy's life, but also the lives of persons similarly situated yet without the support of a loving family. This interest outweighs any rights invoked on Nancy's behalf to terminate treatment in the face of the uncertainty of Nancy's wishes and her own right to life.

This State has expressed a strong policy favoring life. We believe that policy dictates that we err on the side of preserving life. If there is to be a change in that policy, it must come from the people through their elected representatives. Broad policy questions bearing on life and death issues are more properly addressed by representative assemblies. These have vast fact and opinion gathering and synthesizing powers unavailable to courts; the exercise of these powers is particularly appropriate where issues invoke the concerns of medicine, ethics, morality, philosophy, theology and law. Assuming change is appropriate, this issue demands a comprehensive resolution which courts cannot provide.

The efforts of courts to establish guidelines have been less than satisfactory. In *Quinlan,* the New Jersey Supreme Court attempted to establish guidelines for decisions concerning the termination of life support apparatus. More than ten years later, that same court wrote, "We recognize, ... that given the fundamental societal questions that must be resolved, the Legislature is the proper branch of government to set guidelines in this area...." *In re Farrell,* 529 A.2d at 407. *Quinlan* had failed to provide sufficient guidelines to meet the broad diversity of cases presenting termination of life-support issues.

To the extent that courts continue to invent guidelines on an *ad hoc,* piecemeal basis, legislatures, which have the ability to address the issue comprehensively, will feel no compulsion to act and will avoid making the potentially unpopular choices which issues of this magnitude present.

There is another compelling reason to leave changes in policy in this area to the legislature. Representative bodies generally move much more deliberately than do courts; they are a bit slow and ponderous. Courts, on the other hand, are facile and eager to find and impose a solution. But

[t]he medico-legal challenge in this debate is not, as is so often said, to over-

come the failure of the law to keep pace with medical technology. The challenge is to prevent the dilemmas of medical decision-making from forcing upon us undesirable changes in the law.

Koop and Grant, "The 'Small Beginnings' of Euthanasia: Examining the Erosion in Legal Prohibitions Against Mercy–Killing," 2 Journal of Law, Ethics & Public Policy 585, 616 (1986). When facing issues of life and death, society is best served when decisions are surefooted, not swift and ultimately uncertain.

### V.

We find no principled legal basis which permits the coguardians in this case to choose the death of their ward. In the absence of such a legal basis for that decision and in the face of this State's strongly stated policy in favor of life, we choose to err on the side of life, respecting the rights of incompetent persons who may wish to live despite a severely diminished quality of life.

The judgment of the circuit court is reversed.

BILLINGS, C.J., and RENDLEN, J., and REINHARD, Special Judge, concur.

BLACKMAR and HIGGINS, JJ., dissent in separate opinions filed.

WELLIVER, J., dissents in separate opinion filed and concurs in dissenting opinions of BLACKMAR and HIGGINS, JJ.

BLACKMAR, Judge, dissenting.

I substantially agree with the law as expressed by Judge Higgins, except that I believe that the decision of the trial court is supported by established principles of common law and equity, and so find it unneces-sary to discuss constitutional issues which would be of primary importance only if the case were governed by legislation. I believe that the judgment of the circuit court is correct, and would affirm.

The principal opinion states:

We must remember that we decide this case not only for Nancy, but for many, many others who may not be surrounded by the loving family with which she is blessed.

Because of some of the expansive language in the principal opinion, I am constrained to observe that this case involves very special facts. The feeding tube was surgically implanted at a time when Nancy's prognosis was not so definite and certain as it now is, to the end that life be maintained so long as any chance remained for improvement in her condition. The case would not be authoritative if the question were whether the state could require that a tube be similarly implanted, when those near and dear to the patient do not believe that the implant should proceed. Another distinction is that the state is apparently willing to maintain Nancy for so long as she lives, without expense to her parents or others concerned with her condition.[1] The opinion, finally, is not authority for requiring any procedure other than the continued utilization of a feeding tube which is already in place.[2] Thus the decision is of limited applicability, and its automatic application to different situations should not be assumed. Distinguishable cases involve mechanical respirators, radical surgery, blood transfusions, dialysis, chemotherapy, treatment of infection, or, as has been said, surgical implantation of feeding tubes after all hope of amelioration has vanished.

The opinion frankly concedes that other courts, "Nearly unanimously ... have found a way to allow persons wishing to

---

1. This circumstance makes unnecessary discussion of whether the patient's resources must be directed to costs of care such as Nancy requires, even though these resources might be needed by the persons liable for the patient's care, who might have no other means of support, or by others, such as the patient's dependents. It appears that Nancy was married at the time she was injured but that her husband was allowed to obtain a dissolution. This circumstance alone indicates a relativity of values.

2. I simply fail to understand the statement in the principal opinion that this procedure is not heroically "invasive."

die, or those who seek the death of a ward, to meet the end sought." We of course are not bound by the decisions of other courts of coordinate authority, and may adopt unique rules, differing from all others, but we should certainly pause before departing from the overwhelming course of authority. Many other judges have struggled with problems similar to the ones before us. Their opinions demonstrate this struggle. It is often difficult to find the proper words to express a conclusion, and it is easy to criticize the struggles of others. Our task, however, is to decide cases rather than to philosophize. The conclusion of the judges who have wrestled with the issues is entitled to great weight, and is significant in spite of difficulties of expression.

I believe that decisions about Nancy's future should be made by those near and dear to her, and that no state policy requires the state to intervene in these decisions. The principal opinion fails to convince me that the other judges who have dealt with this problem are wrong.

My disagreement with the principal opinion lies fundamentally in its emphasis on the interest of and the role of the state, represented by the Attorney General. Decisions about prolongation of life are of recent origin. For most of the world's history, and presently in most parts of the world, such decisions would never arise because the technology would not be available. Decisions about medical treatment have customarily been made by the patient, or by those closest to the patient if the patient, because of youth or infirmity, is unable to make the decisions. This is nothing new in substituted decisionmaking. The state is seldom called upon to be the decisionmaker.

I would not accept the assumption, inherent in the principal opinion, that, with our advanced technology, the state must necessarily become involved in a decision about using extraordinary measures to prolong life. Decisions of this kind are made daily by the patient or relatives, on the basis of medical advice and their conclusion as to what is best. Very few cases reach court, and I doubt whether this case would be before us but for the fact that Nancy lies in a state hospital. I do not place primary emphasis on the patient's expressions, except possibly in the very unusual case, of which I find no example in the books, in which the patient expresses a view that all available life supports should be made use of. Those closest to the patient are best positioned to make judgments about the patient's best interest.

In footnote 17 the principal opinion cites several cases in which courts have ordered procedures such as blood transfusions, over the religious objections of the parents. The state's goal there is to provide the medical procedures necessary to give the child a meaningful life. A decision to deny such treatment in the face of medical advice may be considered irrational and abusive. Or it may be said that the state balances the child's interest against the parents' religious views, which are considered outside the mainstream. I am sure that courts which have ordered transfusions or other procedures all have relied or acted on the basis of very strong medical opinion. The Cruzans' decision is of a very different nature, and I cannot conclude that it is irrational or abusive.

Nor would I accept the thought that decisions of relatives as guardians about life sustaining measures necessarily require judicial confirmation. I agree with those courts which hold that relatives may ordinarily make important decisions of this kind without going to court, unless there is a challenge.[3] Formal appointment as guardian may be requested, but should not always be necessary. When a person is without close relatives, it may be desirable to appoint a guardian of the person to consider decisions about medical treatment.

I do not find the arguments about the state's interest in "preserving life," and the citation of various statutory provisions in support, particularly helpful. The very existence of capital punishment demonstrates a relativity of values by establishing the

---

**3.** *See, e.g., In re Guardianship of Grant,* 109 Wash.2d 545, 747 P.2d 445, 456 (banc 1987); *In re Drabick,* 200 Cal.App.3d 185, 245 Cal.Rptr. 840 (1988).

proposition that some lives are not worth preserving. Furthermore, the "Living Will" statute, which the majority finds to be "an expression of the policy of this state with regard to sanctity of life," in fact allows and encourages the pre-planned termination of life.

The absolutist provision is also infirm because the state does not stand prepared to finance the preservation of life, without regard to the cost, in very many cases.[4] In this particular case the state has Nancy in its possession, and is litigating its right to keep her. Yet, several years ago, a respected judge needed extraordinary treatment which the hospital in which he was a patient was not willing to furnish without a huge advance deposit, and the state apparently had no desire to help out. Many people die because of the unavailability of heroic medical treatment. It simply cannot be said that the state's interest in preserving and prolonging life is absolute.

It is unrealistic to say that the preservation of life is an absolute, without regard to the quality of life. I make this statement only in the context of a case in which the trial judge has found that there is no chance for amelioration of Nancy's condition. The principal opinion accepts this conclusion. It is appropriate to consider the quality of life in making decisions about the extraordinary medical treatment. Those who have made decisions about such matters without resort to the courts certainly consider the quality of life, and balance this against the unpleasant consequences to the patient. There is evidence that Nancy may react to pain stimuli. If she has any awareness of her surroundings, her life must be a living hell. She is unable to express herself or to do anything at all to alter her situation. Her parents, who are her closest relatives, are best able to feel for her and to decide what is best for her. The state should not substitute its decisions for theirs. Nor am I impressed with the crypto-philosophers cited in the principal opinion, who declaim about the

sanctity of any life without regard to its quality. They dwell in ivory towers.

Likewise unimpressive is the suggestion that the conclusions of the trial court, and of the overwhelming majority of courts which have considered the problem, open the door to wholesale euthanasia of persons considered to be defective, but not in a condition approaching Nancy's. A holding is precedent only for the facts of the particular case. The courts are open to protect incompetents against abuse.

Least of all can I accept the proposition that a judgment as the Cruzans seek is precluded by some amorphous legislative policy "favoring life," so that the courts may only deny this kind of relief until the legislature decrees otherwise. Under Mo. Const. Art. 1, Sec. 14, the courts are open to those who seek relief in proper cases involving actual controversies. The courts have the duty of deciding cases on the basis of what they consider right and just. We cannot shift our burden to the legislature. Nor would I depreciate the capacity of our courts. The common law would be poor indeed if such jurists as Sir Edward Coke and Lord Mansfield had been unwilling to reach their own conclusions about novel issues.

I would grant that my approach to this case is realistic rather than absolute, because it is not possible to express absolutes in situations such as these. I am not persuaded that the state is a better decision-maker than Nancy's parents. We should respect their decision even though, if similarly situated, we might elect to continue the feeding of a loved one. There should be great deference to the trial judge. The appellants have the normal burden of demonstrating error, which these defendants have not done.

The Cruzan family appropriately came before the court seeking relief. The circuit judge properly found the facts and applied the law. His factual findings are supported by the record and his legal conclusions by overwhelming weight of authority.

4. An absolutist would undoubtedly be offended by an inquiry as to whether the state, by prolonging Nancy's life at its own expense, is disabling itself from pending needed treatment to others who do not have such dire prognosis.

The principal opinion attempts to establish absolutes, but does so at the expense of human factors. In so doing it unnecessarily subjects Nancy and those close to her to continuous torture which no family should be forced to endure. I am grasping for words which elude me, and so will not say more.

I would affirm the judgment.

HIGGINS, Judge, dissenting.

In my opinion, the decision in this important case of first impression in Missouri rests on an unsound opinion by a tenuous majority of judges sitting in the case. Accordingly, and with due respect, I dissent.

The trial court ruled that Ms. Cruzan had the right to be free from unwanted intrusion of her body by medical agents of the State and ordered the defendant doctors to honor the expressed wishes of Ms. Cruzan and the consent and authority given by her guardians for removal of a surgically implanted life support device. The majority cites more than 50 appellate decisions from 16 jurisdictions that support and validate the trial court's findings of fact, conclusions of law and the judgment in this case; yet, ironically, it reverses the judgment in favor of Ms. Cruzan by finding "that the trial court erroneously declared the law." Because the majority acts in my view, contrary to the facts and the law, and because of the importance of the case and its effect on the rights of the citizens of Missouri, I register my formal dissent. It begins with the judgment entered by the trial court:

"On Tuesday, January 11, 1983 at approximately 12:50 a.m., Nancy Beth Davis nee Cruzan, our ward, was driving a 1963 Rambler Classic Sedan, alone, East on Elm Road (a/k/a Krummel Nursery Road), 2.1 miles East of Alternate U.S. Highway 71, Southeast of Carthage, Missouri, Jasper County. Elm Road is a two lane east-west asphaltic pavement, 18 feet wide on an easterly uphill grade in an open area. The weather was clear and the pavement dry on a cool January night. The driver's condition is unknown prior to the accident. An accident was reported and Trooper Dale Penn, Missouri State Highway Patrol was summoned to the scene at 12:54 a.m., arriving at 1:00 a.m. where he found Nancy lying face down in a ditch some 35 feet across a private driveway south and east from her ____ overturned-vehicle which was resting in a ditch on the west side of the private driveway with all four wheels skyward. Nancy was lifeless and not breathing when Trooper Penn examined her without moving her. She had apparently expired. She was apparently eastbound at a speed too fast for the conditions when her car ran off the left (north) side of the pavement and struck some small trees, a mailbox and then swerved back across and off the pavement on the right (south) side and ran through a fence and overturned several times coming to rest on its top some 210 feet from the mailbox on the north side of Elm Road in the ditch of the private driveway.

"The Carthage Fire Department was notified. Squad 107 was dispatched at 1:05 a.m.; Lieutenant Ed Nuse in command, Firefighter Bob Smith driving, and Firefighter Mike Lee on the back step. They arrived at 1:12 a.m. Lee commenced a search of the area for a baby reportedly thrown from the vehicle while Lt. Nuse and Smith went to the assistance of the paramedics with Firefighter Smith administering CPR when Nancy resumed breathing.

"At approximately 1:02 a.m. the Carthage Ambulance service at McCune–Brooks Hospital was notified and Paramedics Robert Williams and Rick Maynard were dispatched in an ambulance. On arrival at 1:09 a.m., they found Nancy lying face down in the ditch 'code blue,' i.e. in total respiratory and cardiac arrest. She had some facial lacerations, lacerations within her mouth, cuts and massive swelling of the face. The only evidence of the cause of death was her position, lying face down in the ditch in a position in which she could not breathe. No evidence of severe head injury or other explanation of 'code blue' was observed. Cardiopulmonary resuscitation (CPR) was commenced. She was unconscious. Advance life support procedures were instituted at 1:11 a.m. per orders of the emergency room doctor at the

hospital. A tube was placed down her windpipe to gain complete control of her respiratory system and at 1:12 a.m. an I.V. was introduced, administering medication and sodium bicarbonate because she had been 'down a while.' Results were achieved at about 1:12 a.m. with a BP 60/0. It couldn't be heard by stethoscope but could be felt by fingertips. At 1:13 a.m., the heart monitor disclosed a pulse rate around 92 per minute and BP 80/0. She started spontaneous respiration 12 per minute, a rate normal for some adults. Suction was returning 'a lot of blood and mucous.' At 1:56 a.m., after being prepared, she was transported to McCune Brooks Hospital Emergency Room with vital signs of BP 110/80, pulse 92, and respiration 14 and spontaneous. Arrival was at 2:03 a.m.

"She was examined and it was determined that she should be taken to Freeman Hospital, Joplin, a distance of about 21 miles. After further efforts to maintain a stable condition, she was transported.

"Upon arrival at Freeman Hospital Emergency Room she was still unconscious, now requiring manual respiratory assistance, unresponsive to painful stimuli and wearing mass trousers. Her vital signs were stabilized and she was taken to surgery.

"An exploratory laparotomy disclosed a laceration to her liver which was repaired. Multiple facial fractures were repaired by an oral surgeon. It was noted she did not require much sedation or anesthetic.

"Dr. H.S. Majzoub, a neurosurgeon, examined Nancy in the ICU following surgery, reviewing a CAT scan of her head showing no significant abnormalities. He found the upper hemispheric ventricles of the brain essentially normal in size with no evidence of intracranial mass lesion or any edema. All her basal systems appeared normal. The diagnosis was probable cerebral contusions compounded by significant anoxia with the prognosis hinging on the duration of her anoxia which was unknown to him.

"Estimates of the duration of Nancy's anoxia range from 6 to 20 minutes with the most probable duration 12 to 14 minutes. Less than 6 minutes is perhaps the maximum period for the brain to be without oxygen without causing some permanent brain damage. The longer the duration, the more the permanent damage.

"Nancy's recovery from surgery was apparently uneventful. She remained in a coma for about three more weeks when she appeared to have progressed to an unconscious state. She has never recovered or improved from this state. On February 1, 1983, with the consent of her then husband, a # 20 gastrostomy feeding T-tube was surgically inserted. This tube has been her only source of nutrition and hydration since her admission to the Mt. Vernon State Hospital. She was discharged from Freeman Hospital as improved on February 21, 1983 to St. John's Regional Medical Center, Brady Rehabilitation Facility, Joplin, where rehabilitative measures were attempted for six weeks when she was discharged essentially unimproved and unresponsive to rehabilitation. She could not be fed orally, being unable to swallow a significant amount of food or water.

"Her husband took her to his grandmother's home where she was served by round the clock professional nursing care. After two or three weeks, she developed pneumonia, probably from food aspiration as a result of oral feeding efforts and was rehospitalized for a short time and then returned to the grandmother's home.

"A short time later, she was admitted to a local nursing home where after about six days, she was admitted to Jane Chinn Hospital, Webb City, with a fever of 107 from some kind of an infection. She was discharged to be admitted to the Mt. Vernon State Hospital on October 19, 1983 where she remains a patient.

"Her parents, the Petitioners, were appointed guardians and conservators after hearing on January 25, 1984 and Letters duly issued. Her husband did not attend or inquire of any of the proceedings. A dissolution of marriage was subsequently decreed.

"Continuous observations by primary care givers, her family and attending physicians and a recent neurological examination

by Dr. George Wong report that Nancy remains unconscious, is unresponsive to her environment with atrophy and contractures of her four extremities. Her fingernails now sometimes cut into her wrists. She is a spastic quadriplegic. Her vital signs, BP 130/80, pulse 78 and regular, and respiration spontaneous at 16 to 18 per minute, all essentially normal for a 30 year old female. At no time has her electroencephalogram registered isoelectric or flat. Her condition is considered permanent. A recent CAT scan of her head reveals abnormalities suggesting severe irreversible upper hemispheric brain damage with massive enlargement of ventricles from filling with cerebrospinal fluid because the brain is degenerating. The degeneration is called cerebral cortical atrophy which is progressive from her initial condition reflected on CAT scan. The fluid is replacing the area where there is no more brain tissue. This permanent and irreversible condition is the apparent result of time duration of anoxia which was initially feared by the examining and consulting neurosurgeon. Her normal weight of 115 pounds has now risen to about 140 pounds.

"Prior to the accident, Nancy resided with her husband of about a year, Paul, further east on Elm Road from the accident scene. She was employed on either the 3 to 11 or the graveyard shift at Schreiber Foods. She is described as a vivacious, active, outgoing, independent person who preferred to do for herself.

"About a year prior to her accident in discussions with her then housemate, friend and co-worder, she expressed the feeling that she would not wish to continue living if she couldn't be at least halfway normal. Her lifestyle and other statements to family and friends suggest that she would not wish to continue her present existence without hope as it is.

"After examination and treatment by a number of physicians, including three neurologists, a neurosurgeon, and a specialist in rehabilitative medicine and considering the observations of the primary nursing care providers, her family and co-guardians, the Court by clear and convincing evidence finds the current medical condition of our ward to be as follows:

1. That her respiration and circulation are not artificially maintained and within essentially normal limits for a 30 year old female with vital signs recently reported as BP 130/80; pulse 78 and regular; respiration spontaneous at 16 to 18 per minute.

2. That she is oblivious to her environment except for reflexive responses to sound and perhaps to painful stimuli.

3. That she has suffered anoxia of the brain resulting in massive enlargement of the ventricles filling with cerebrospinal fluid in the area where the brain has degenerated. This cerebral cortical atrophy is irreversible, permanent, progressive and ongoing.

4. That her highest cognitive brain function is exhibited by her grimacing perhaps in recognition of ordinarily painful stimuli, indicating the experience of pain and her apparent response to sound.

5. That she is spastic quadriplegic.

6. That she has contractures of her four extremities which are slowly progressive with irreversible muscular and tendon damage to all extremities.

7. That she has no cognitive or reflexive ability to swallow food or water to maintain her daily essential needs. That she will never recover her ability to swallow sufficient to satisfy her needs.

"The Petitioners, her mother and father, and duly appointed co-guardians, seek this Court's approval of their request to the Respondent Lampkins, Superintendent of the Mt. Vernon State Hospital, to discontinue further nutrition and hydration by gastrostomy tube and if refused by Respondents after this Court's approval then to direct Respondents to carry out their request.

"The only economic considerations in this case rest with Respondent's employer, the State of Missouri, which is bearing the entire cost of care. Our ward is an adult without financial resources other than Social Security whose not inconsiderable medical insurance has been exhausted since January 1986.

"The Court has been well and ably advised in the premises by counsel for the Petitioners, William Colby, Esq., Kansas City and Walter Williams, Esq., Joplin; for the Respondents, The Honorable William L. Webster, Attorney General of Missouri, Robert Presson, Esq., Assistant Attorney General, and Robert R. Northcutt, Esq., General Counsel Missouri Department of Health, all of Jefferson City; and the Court appointed Guardians Ad Litem and attorneys for our Ward, Thad C. McCanse, Esq., and David Mouton, Esq., both of the law firm of Flanigan, McCanse and Lasley, Carthage, and Amici Curiae Briefs from Society For The Right to Die, the Ethics and Advocacy Task Force of the Nursing Home Action Group filed by the National Legal Center for the Medically Dependent and Disabled and the Missouri Citizens For Life.

"Now being fully advised in the premises, the Court enters its conclusions and judgment, accordingly.

"The due process clause of the Constitution of the United States and the statutes of the State of Missouri [1] require clear and convincing evidence of a physical or mental condition before a person may be declared incapacitated and a guardian appointed. It follows that no less a standard must be met before the Court may authorize the Guardians to request Respondents to withdraw nutrition and hydration from their Ward with the inevitable attendant consequences of carrying out such an act.

"We believe the Petitioners, Co-guardians, her parents, have met this heavy burden as the Court has found her present medical condition to be by clear and convincing evidence.

"The maintenance of nutrition and hydration to our Ward, unresponsive to her environment and without hope of further recovery becomes medical treatment when it can only be provided by gastrostomy tube. While the feeding itself may be more nutritional than medical, a surgical procedure personally invasive to the body is required to implant the tube in the stomach and if repair or replacement of the tube should become necessary further surgical procedure would be required. Nutrition or hydration under these circumstances is medical treatment because it can only be and has for the past five years been maintained by the surgically implanted gastrostomy tube.

"Nancy's present unresponsive and hopeless existence is not the will of the Supreme Ruler but of man's will to forcefully feed her when she herself cannot swallow thus fueling respiratory and circulatory pumps to no cognitive purpose for her except sound and perhaps pain.

"Her expressed thoughts at age twenty-five in somewhat serious conversation with a housemate friend that if sick or injured she would not wish to continue her life unless she could live at least halfway normally suggests that given her present condition she would not wish to continue on with her nutrition and hydration.

"The Law of this State [2] and legislatively enunciated public policy prohibits withholding or withdrawal of nutrition or hydration as a death-prolonging procedure and euthanasia or mercy killing by act or omission. Death-prolonging procedures may only be withheld if no innocent third parties require the protection of the state, no homicide or suicide occurs and good ethical standards in the medical profession are maintained. Our law does recognize an individual's primary right to refuse medical treatment and to direct physicians attending to withhold or withdraw further treatment.

"In this case there are no innocent third parties requiring state protection, neither homicide nor suicide will be committed and the consensus of the medical witnesses indicated concerns personal to themselves or the legal consequences of such actions rather than any objections that good ethical standards of the professions would be breached if the nutrition and hydration were withdrawn the same as any other

---

1. *Addington v. Texas* (1979) 441 U.S. 418, 99 S.Ct. 1804, 60 L.Ed.2d 323; Section 475.075.7, RSMo 1986.

2. Section 459.015.1; Section 459.010(3); Section 459.055(1)–(5).

artificial death prolonging procedures the statute specifically authorizes. Euthanasia is not statutorily defined and there are differing definitions in both lay and professional terms.

··"There is a fundamental natural right expressed in our Constitution as the 'right to liberty' [3], which permits an individual to refuse or direct the withholding or withdrawal of artificial death prolonging procedures when the person has no more cognitive brain function than our Ward and all the physicians agree there is no hope of further recovery while the deterioration of the brain continues with further overall worsening physical contractures. To the extent that the statute or public policy prohibits withholding or withdrawal of nutrition and hydration or euthanasia or mercy killing, if such be the definition, under all circumstances, arbitrarily and with no exceptions, it is in violation of our ward's constitutional rights by depriving her of liberty without due process of law. To decide otherwise that medical treatment once undertaken must be continued irrespective of its lack of success or benefit to the patient in effect gives one's body to medical science without their consent. We could then sing, less fervently of the land of the free, but as medical science advances to new horizons, much more fervently of the land of the brave. If we are the victim we might not be cognizant of our bravery.

"To deny the Co-guardians the authority to act in this instance is to deprive the Ward of the equal protection of the law which is constitutionally guaranteed.[4]

"In this case the Court acts only to authorize the Co-guardians to exercise our Ward's constitutionally guaranteed liberty to request the Respondents to withhold nutrition and hydration.

"The Co-guardians are required only to exercise their legal authority to act in the best interests of their Ward as they discharge their duty and are free to act or not with this authority as they may determine.

"The Respondents, employees of the State of Missouri, are directed to cause the request of the Co-guardians to withdraw nutrition or hydration to be carried out. Such a request having Court approval, shall be taken the same as a request for discontinuance of any other form of artificial life support systems. Under those circumstances, further feeding could raise the spectre of civil liability and recovery of damages from the provider. The care and compassion the Respondents and their associates have already shown our Ward and her guardians, incomparable by any standards, are in keeping with the overwhelming tragedy that has been visited upon us all.

"IT IS SO ORDERED, ADJUDGED AND DECREED this 27th day of July, 1988."

The mandate of this Court for its review of this case is that the judgment of the trial court "will be sustained ... unless there is no substantial evidence to support it, unless it is against the weight of the evidence, unless it erroneously declares the law, or unless it erroneously applies the law." *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). "Due regard shall be given to the opportunity of the trial court to have judged the credibility of witnesses." Rule 73.01(c)(2). I submit under this mandate, and for the reasons that follow, the judgment should be affirmed.

Appellants Harmon and Lamkins contend the court erred in concluding that the living will statute does not prohibit withdrawal of the artificial life support in this case; in holding that refusal of the withdrawal would deny Nancy Cruzan's "Right To Liberty" and to deny the guardians to act on her behalf would deprive her of equal protection of the law; in failing to decide whether withdrawal of the support was appropriate, in failure to have clear and convincing evidence to support its findings, and in identifying the factors that authorize the withdrawal.

---

**3.** Article I, Section 2; Article I, Section 10; Constitution of Missouri; Article XIV Amendments to the United States Constitution.

**4.** Section 2, Article I Constitution of Missouri; Article XIV, Section 1. Amendments to the United States Constitution.

Appellant guardian ad litem advises this court:

> we informed the [trial] court that we felt it was in Nancy Cruzan's best interests to have the tube feeding discontinued. We now find ourselves in the position of appealing from a judgment we basically agree with. We felt then that an appeal should be made because our responsibility to her as attorneys and guardians ad litem was to pursue this matter to the highest court in the state in view of the fact that this is a case of first impression in Missouri.

Appellant guardian ad litem contends similarly to the contentions of appellants Harmon and Lamkins. He contends additionally that the court erred in authorizing the guardian ad litem to exercise Nancy Cruzan's right to refuse life sustaining medical treatment because to do so conflicts with a guardian's statutory duty and the right to refuse life support here is personal to Nancy Cruzan.

Respondents co-guardians Lester L. Cruzan, Jr., and Joyce Cruzan contend for the judgment of the trial court asserting that the trial court was correct in ruling that their daughter, Nancy Cruzan, has a right to be free from invasive, unwanted and non-beneficial treatments because such rights are granted to all persons by the right to liberty found in the natural law, the common law right to self-autonomy and the constitutional rights to liberty and privacy; that she did not forfeit the right to be free of intrusive treatment because of her incompetency when her guardians consented according to her rights; that no state interest is present that outweighs her right to be free from the state's intrusive medical care; that all the credible evidence, medical and otherwise, supports the withdrawal of the artificial life system implanted in Nancy Cruzan; that the living will statute does not stand to exclude withdrawal of the surgically implanted support system; and that the appellant doctors' hospital cannot disregard the request of the guardians to withdraw the unwanted life support.

Amicus curiae briefs in support of appellants were filed by The Missouri Citizens For Life and The Association For Retarded Citizens of the United States and The Ethics and Advocacy Task Force of the Nursing Home Action Group. Amicus curiae briefs in support of respondents-guardians and the judgment in their favor were filed by The American Medical Association; Society For The Right To Die; Concern For Dying; SSM Health Care System and The Center For Health Care Ethics, St. Louis University Medical Center; and The American Academy of Neurology.

Contrary to the diversionary question posed by the majority, the parties as aforesaid present the question answered by the trial court in favor of Nancy Cruzan: Whether, under the evidence and applicable law, Nancy Cruzan, an adult incompetent, has the right to be free from an unwanted artificial life support device surgically implanted in her body, requested and authorized to be removed by her guardians. Yet no matter how the question is posed, the judgment for review under *Murphy* is supported by the law and the facts and should be upheld.

### The Facts

Although appellants emphasize selected testimony for purposes of their arguments, none of appellants' contentions dispute the facts as found by the trial court. Accordingly, the facts stand as found and recited in the judgment. *Murphy;* Rule 73.01.

Nevertheless, the majority refinds facts to support its result, an inexcusable exercise for this Court. For example, the majority states, "the continuation of feeding through the tube is not heroically invasive." Yet the trial court found:

> a surgical procedure personally invasive to the body is required to implant the tube in the stomach and if repair or replacement of the tube should become necessary further surgical procedure would be required. Nutrition or hydration under these circumstances is medical treatment because it can only be and has for the past five years been maintained

by the surgically implanted gastrostomy tube.

The majority's statement that subject medical treatment is not invasive is contrary to both the facts of this case and the cases that describe the use of a gastrostomy tube as "intrusive as a matter of law." *McConnell et al. v. Beverly Enterprises, et al.,* No. 0293888, slip op. at 25 (Conn.Super.Ct. July 8, 1988); *Brophy v. New England Sinai Hosp.,* 398 Mass. 417, 435, 497 N.E. 2d 626, 636 (1986).

For further example, the majority says, "the statements [in regard to whether Nancy would want to receive this medical treatment] attributable to Nancy in this case are similarly unreliable for the purpose of determining her intent." The trial court, however, found, by clear and convincing evidence, "given [Nancy's] present condition she would not want to continue on with her nutrition and hydration." The record is replete with evidence to support this finding and the majority should not say otherwise. *Murphy;* Rule 73.01.

Finally, the majority says, "We further hold that the evidence offered at trial as to Nancy's wishes is inherently unreliable." This substitution of judgment for that of the trial court constitutes an incredible denial of the deference due the trial court's exclusive power to judge the credibility of witnesses. Rule 73.01(c)(2).

### The Law

All parties agree this is a case of first impression. Accordingly, it is proper to look to the law of other jurisdictions that have ruled on the question in this case. Although the majority cites more than 50 cases from 16 states that support the judgment in this case, it rejects all and fails to point to a single case in support of its analysis and ultimate conclusion to reverse the judgment. Again, the irony in the majority view is its reversal on the ground of "erroneous declaration of law." Without exception, the cases cited in the majority's footnote 4 uphold a right to refuse life sustaining medical treatment, either personally or through a guardian.

Specifically in point and persuasive for resolution of this case are: *Bouvia v. Superior Court,* 179 Cal.App.3d 1127, 225 Cal.Rptr. 297 (1986) (discussed by the majority): The court allowed a competent patient to have a nasogastric tube removed from her body based on a constitutional right to privacy and a common law right to refuse treatment. *In Re Drabick,* 200 Cal. App.3d 185, 245 Cal.Rptr. 840 (1988): The court allowed a conservator to exercise the right on behalf of an incompetent patient in a persistent vegetative state even without prior court approval if the decision is made in good faith. *Rassmussen v. Fleming,* 154 Ariz. 207, 741 P.2d 674 (1987): A public fiduciary was allowed to remove a nasogastric feeding tube from a nursing home patient in a chronic vegetative state. The court balanced the constitutional right to privacy and the common law right to refuse medical treatment against the state's interests. In light of the minimal benefit of continued medical treatment, the court found that the patient's rights, exercised through his guardian, outweighed the state's interest in preserving life. *Brophy v. New England Sinai Hospital, Inc.,* 398 Mass. 417, 497 N.E.2d 626 (1986): The court engaged in the balancing test espoused by the majority. It held that the common law right to refuse treatment, and the constitutional right of privacy are not absolute, but held a gastronomy tube to be "intrusive" as a matter of law and found that the patient's rights outweighed the state's interests, notwithstanding that Brophy's condition was not terminal. *Foody v. Manchester Memorial Hospital,* 40 Conn. Super. 127, 482 A.2d 713 (1984): The patient was in a semicomatose state, kept alive by life support systems. The patient was incompetent, and had never expressed her view on whether she would want to be kept alive under her circumstances. The court recognized that there were both constitutional and common law rights to be freed from unwanted medical treatment. The court applied a balancing test and concluded "that no state interest [including the preservation of life] exists to the degree necessary to outweigh the right of Sandra Foody to exercise her right to refuse fur-

ther life-sustaining treatment." *Foody,* 482 A.2d at 720. The court "recognized the right of a guardian of the person to vicariously assert the right of an incompetent or unconscious ward to accept or deny medical care. To deny the exercise because the patient is unconscious is to deny the right. It is incumbent upon the state to afford an incompetent the same panoply of choices it recognizes in competent persons." *Foody,* 482 A.2d at 718. *Corbett v. D'Alessandro,* 487 So.2d 368 (Fla.App.1986): The court upheld the constitutional right of a person in a persistent vegetative state to forgo the use of artificial life support (a nasogastric feeding tube), and allowed the patient's husband to exercise the right on her behalf. Florida has a living will statute similar to Missouri's, *see* Fla.Stat. § 765.03(3)(b) (Supp.1984). *Estate of Prange,* 166 Ill. App.3d 1091, 117 Ill.Dec. 595, 520 N.E.2d 946 (1988): The patient had made her wishes known while she was competent. The court upheld the guardian's decision that the patient would have wished to terminate nutrition and hydration and allowed the guardian to carry out that wish based on a common law right to be free from non-consensual bodily invasions and a constitutional right of privacy. *In Re Gardner,* 534 A.2d 947 (Me.1987): The court permitted the patient's feeding tube to be removed based on a common law right to refuse medical treatment. The court affirmed the trial court's finding that it was the patient's clear and convincing intent not to be maintained on artificial life support in a vegetative state. It based this finding on statements he had made to his friends and family before the automobile accident which resulted in his incapacitation. The Supreme Court held "that when an individual has clearly and convincingly in advance of treatment expressed his decision not to be maintained by life-sustaining procedures in a persistent vegetative state, health care professionals must respect that decision." 534 A.2d at 953. In addressing the emotional distinction between nutrition and hydration and other medical procedures, the court stated:

The symbolism is lost in the artificial introduction of food and water into the body of someone in Gardner's unfortunate condition. There is no symbolic virtue in imposing that procedure upon the body of a person who previously declared that he would not want to receive such treatment but who now is no longer able personally to prevent what is being done to his body.

*Id.* at 955. *McConnell et al. v. Beverly Enterprises et al.,* No. 0293888 (Conn.Super.Ct. July 8, 1988): The patient was diagnosed as being in a persistent vegetative state as a result of traumatic brain injuries sustained in an automobile accident. Her family requested the court to order the removal of the gastrostomy tube which was providing her nutrition and hydration and to allow her to die. This was a case of first impression in Connecticut where a statute allowed the withdrawal of a respirator, but excluded the withdrawal of nutrition and hydration. Despite the statute, the court held there was a constitutional right to refuse medical treatment, and a common law right of self determination to accept or reject medical treatment. The patient, while competent, had indicated she would not want to be kept alive by life-prolonging equipment. The court further held:

other cases that have been decided ... found no distinction between the discontinuation of a respirator and any of the variety of artificial nutrition and hydration methods.... While there is more difficulty in coming to terms with the discontinuation of nutrition and hydration, no appellate court that has addressed this precise issue has found such a distinction.

*McConnell,* slip op. at 22. The court held that a guardian could exercise a patient's rights and stated, "[w]hen a family is unanimous ... the court must place great weight on their decision to enforce the desires of their loved one." *McConnell,* slip op. at 26. *See also, Delio v. Westchester County Medical Center,* 129 A.D.2d 1, 516 N.Y.S.2d 677 (1987); *Leach v. Akron General Medical Center,* 68 Ohio Misc. 1, 426 N.E.2d 809 (Comm.Pl.1980); *Matter of Welfare of Colyer,* 99 Wash.2d 114, 660 P.2d 738 (1983).

Because New Jersey broke the first ground in this area, its cases deserve particular attention. The majority cites *Matter of Jobes*, 108 N.J. 394, 529 A.2d 434 (1987), contending it is factually similar to Nancy's case. In *Jobes*, however, the court found the evidence was not clear and convincing that Mrs. Jobes would want to die if faced with life in a persistent vegetative state. Nonetheless, the court allowed her family's wishes to be carried out under the "substituted judgment" test.

New Jersey has perhaps the longest line of cases on this subject. In the *Jobes* opinion, the court briefly restated its rationale by tracing the relevant case law:

> In summary, we state again that the fateful decision to withdraw life-supporting treatment is extremely personal. Accordingly a competent patient's right to make that decision will outweigh any countervailing state interests. [*In re Farrell*, 108 N.J. 335, 354, 529 A.2d 404, 414.] An incompetent patient does not lose her right to refuse life-sustaining treatment. Where such a patient has clearly expressed her intentions about medical treatment, they will be respected. *[In re] Peter*, 108 N.J. at 378, 529 A.2d at 425.

529 A.2d 434, 451.

The court only then turned to the problem of a patient whose wishes are not clear, and restated the "substituted judgment" doctrine as developed in *In re Quinlan*, 70 N.J. 10, 355 A.2d 647 (1976). Significantly, the problem in *Quinlan* and *Jobes* is not before this Court because the trial court found by clear and convincing evidence that Nancy Cruzan would have chosen to have the feeding tube withdrawn had she been competent to choose. Judgment, *supra*.

Notwithstanding this distinction, the majority engages in criticism of the New Jersey Supreme Court: "In *Quinlan*, the New Jersey Supreme Court attempted to establish guidelines for decisions concerning the termination ' of life support apparatus. More than ten years later, that same court wrote, 'We recognize, ... that given the fundamental societal questions that must

be resolved, the legislature is the proper branch of government to set guidelines in this area....' *In re Farrell*, 529 A.2d at 407. *Quinlan* had failed to provide sufficient guidelines to meet the broad diversity of cases presenting termination of life-support issues." The majority projects the impression that in *In re Farrell* the New Jersey Supreme Court found some inherent fault in their *Quinlan* decision. The New Jersey Supreme Court, however, recognized the legislature was the proper branch to set guidelines in this area, yet went on to hold "[n]evertheless, patients and their families and physicians are increasingly being faced with these difficult and complex decisions without legislative guidelines and ... [u]ntil the Legislature acts, it is to the courts that the public must look for the guidelines and procedures under which life-sustaining medical treatment may be withdrawn or withheld." *In re Farrell* at 408. The true lesson of the New Jersey cases is that more than ten years had elapsed since the *Quinlan* decision, yet an unresponsive legislature had failed to establish procedures and guidelines for the withholding or withdrawing of life sustaining medical treatment.

The only case cited by the majority in which a court did not allow the removal of life-sustaining medical treatment is *Matter of Conroy*, 98 N.J. 321, 486 A.2d 1209 (1985). It is distinguishable because the guardian *ad litem* opposed withdrawal of the feeding tube, and there was no evidence from which the court could draw an inference as to the patient's intent, or general beliefs on the subject of life prolonging procedures.

Not mentioned by the majority is *Gray v. Romeo*, 697 F.Supp. 580 (D.R.I.1988). It is the most recent case on removal of a feeding tube and deals with all the issues presented in Nancy's case. In *Gray*, as in Nancy's case, the family was appointed guardian and a guardian *ad litem* was appointed. In *Gray*, as in Nancy's case, the effect of removal of the feeding tube would bring about death. Marcia Gray, like Nancy, was in a persistent vegetative state. Marcia Gray, like Nancy had, while

competent, voiced her wish not to have her life sustained by life support systems when there is no hope of recovery. Marcia Gray's guardians, like Nancy's guardians, felt it was in her best interest and that she would not want to have life sustained in a persistent vegetative state with no hope of recovery. Also, the health care personnel caring for Marcia Gray were adamant in their opposition to the proposal to remove nutrition and hydration.

The distinction between Marcia Gray's case and the majority's treatment of Nancy's appeal is that the court in *Gray*, based on the above facts, followed the law and granted the request of the guardians to remove the feeding tube and thus allowed Marcia Gray to exercise her rights. The court stated the issue, "whether or not the state can insist that a person in a vegetative state incapable of intelligent sensation, whose condition is irreversible, may be required to submit to medical care under circumstances in which the patient prefers not to do so." *Gray* at 584.

The logic and legal analysis of the *Gray* court follow:

First, the court resolved the issue whether there is a right to refuse life-sustaining medical treatment. The court discussed the United States Supreme Court decisions relating to the issue and held,

"although the Supreme Court has never directly addressed the issue of a person's federal constitutional right to refuse life-sustaining medical treatment, the Court's decisions have repeatedly affirmed the principle of individual self-determination. A person has the right, subject to important state interests, to control fundamental medical decisions that affect his or her own body. This right, whether described as the principle of personal autonomy, the right of self-determination, or the right of privacy, is properly grounded in the liberties protected by the Fourteenth Amendment's due process clause. This right is also grounded in the notion of an individual's dignity and interest in bodily integrity." *Gray* at 585.

The majority in dealing with the Supreme Court decisions on this subject cites *Bowers v. Hardwick*, 478 U.S. 186, 194, 106 S.Ct. 2841, 2846, 92 L.Ed.2d 140, *reh'g. denied* 478 U.S. 1039, 107 S.Ct. 29, 92 L.Ed.2d 779 (1986) for the proposition that the right to privacy does not go beyond the bounds of the right to procreate within the bonds of marriage. The *Gray* court held, "[d]ecisions concerning medical treatment bear little connection to the claimed constitutional right to engage in homosexual acts, rejected in *Bowers*. Instead, the right to control fundamental medical decisions is an aspect of the right of self-determination and personal autonomy that is 'deeply rooted in this Nation's history and tradition.'" *Gray* at 586.

Second, the court resolved the issue "whether nutrition and hydration supplied through a gastrostomy tube are a form of medical treatment that Marcia Gray may properly refuse." *Gray* at 586. Unlike the majority's avoidance of this issue[1] the *Gray* court looked to other case law "addressing this issue and concluded that analytically no difference exists between artificial feeding and other life support measures." *Gray* at 586.

Although an emotional symbolism attaches itself to artificial feeding, there is no legal difference between a mechanical device that allows a person to breathe artificially and a mechanical device that artificially allows a person nourishment. If a person has the right to decline life on a respirator, then a person has the equal right to decline a gastrostomy tube. Accordingly, Marcia Gray's right to refuse medical treatment includes the right to have the [gastrostomy tube] removed. *Gray* at 587 (citation omitted).

Third, the court resolved the issue whether Marcia Gray, an incompetent like Nancy, "still retains her right to decide whether the [gastrostomy tube] remains implanted or removed." *Gray* at 587. Un-

---

1. "The issue is not whether the continued feeding and hydration of Nancy is medical treatment." ment."

like the majority, the court in *Gray* followed the prior case law and held "the right to refuse medical treatment 'must extend to the case of an incompetent patient because the value of human dignity extends to both. Any other view would permit obliteration of an incompetent's panoply of rights merely because the patient could no longer sense the violation of those rights.'" *Gray* at 587 (citations omitted).

The majority states, "A guardian's power to exercise third party choice arises from the state's authority, not the constitutional rights of the ward." The majority further states "we ... find no statutory basis for the argument that the guardian possesses authority, as a guardian, to order the termination of medical treatment." To the contrary, § 475.123.1, provides, "No medical or surgical procedure shall be performed on any ward unless consent is obtained from the guardian of his person...." RSMo 475.123.1 (1986). As the court in *Gray* held:

> The [gastrostomy tube] was initially inserted with the consent of Marcia Gray's husband. No analytical difference exists between withholding and withdrawing medical treatment, however. A patient's right to refuse medical treatment obviously includes both the right to refrain from beginning the treatment and the right to order it's cessation. 'Moreover, from a policy standpoint, it might well be unwise to forbid persons from discontinuing a treatment under circumstances in which the treatment could permissibly be withheld. Such a rule could discourage families and doctors from even attempting certain types of care and could thereby force them into hasty and premature decisions to allow a patient to die.'

*Gray* at 588 n. 4.

Last, the *Gray* court, following cited authority, balanced an incompetent's right to self determination against the state's interest in preserving life for all and held the incompetent's rights prevailed. In contrast, the majority balanced these same interests in Nancy's case yet declared, without authority, that the state's interest

prevailed. The majority has failed to recognize

> [a] state's interest in preservation of life is highest when the state seeks to protect an individual who may potentially be the subject of abuse because he or she cannot protect his or her own interests. That clearly is not the situation here; rather, a number of persons are attempting to ensure that [an incompetent's] wishes are respected. In this situation [the incompetent's] right to self-determination must prevail over the state's interest in preserving life for all.

*Gray* at 589.

At the outset the majority asserts: "Because we find that the trial court erroneously declared the law, we reverse." A reader of the ensuing opinion searches and waits in vain for citation of a single authority to support the majority's bold assertion and its drastic action. Yet the majority itself recognizes that courts in at least 16 states have found a way to allow persons in the plight of Nancy Cruzan wishing to die to meet that end. As demonstrated in this dissenting opinion, the cases recognized in the majority's footnote 4 uphold a right to refuse life sustaining medical treatment, either personally or through a guardian. Comparison of the majority's opinion and this dissenting opinion reveals no disagreement on the "White Horse" case law available and applicable to resolution of the issues in this case. These authorities provide all the support necessary for the trial court's declarations and applications of law under the facts of this case. Should not a reader ask the majority why it projects the irony of recognizing yet rejecting this abundance of dispositive case law in favor of its non-supported assertion of "erroneous declaration of law?" Is it because of its "public policy" bootstrapped from a statute that all parties in this case, the trial judge and the majority agree has no application in this case; or is it because the majority would have this Court abdicate its responsibilities to Nancy Cruzan under the Constitution and the common law and deny her rights in deference to some yet unspecified and unconsidered legisla-

tion [2]; or is it because of the majority's unarticulated "concerns of medicine, ethics, morality, philosophy, theology and law"; or is it simply because the majority elects to ignore the facts and law of this case and "choose(s) to err" on the side of life of incompetent persons who may wish to live, a case not before the Court at this time? [3]

In summation, respondents' counsel observed: "The family came to the trial court after long and careful deliberation. Either way this Court decides, the Cruzan family does not win. The trial court found it was Nancy's wish, clear wish, to be free from this unwanted medical treatment and we would request that this Court affirm that."

In my opinion, the trial judge made a courageous voyage in an area not previously charted by Missouri courts, and the resulting judgment is supported unquestionably by both the evidence and the law. Nancy Cruzan and those Missourians who may be in her situation deserve the common law and constitutional rights that the trial court has accorded them. This Court should do no less and affirm that judgment.

WELLIVER, Judge, dissenting.

I respectfully dissent and concur in the dissenting opinions of both Higgins, J. and Blackmar, J.

This case is not before us to establish groundwork for future right-to-life litigation. It is here to examine and determine Nancy Cruzan's right to die under the federal and state constitutions, under our existing case law which requires us to defer to the facts as found below, and under the large body of precedent established by the courts of our sister states.

The principal opinion, states that "[n]one of the parties argue that Missouri's Living Will statute applies in this case." *Cruzan v. Harmon v. McCanse,* 760 S.W.2d 408, 420 (Mo. banc 1988). In this respect the parties are eminently correct. The opinion unnecessarily and by dictum seeks to place a mantle of constitutionality on the Missouri Living Will Statute, which statute in my opinion has been a fraud on the people of Missouri from the beginning and which statute, if directly attacked, must, in my opinion, be held to be unconstitutional.[1]

As pointed out in the principal opinion, *Cruzan v. Harmon v. McCanse,* 760 S.W. 2d at 419 (Mo. banc 1988), the Missouri Living Will Statute is modeled after the Uniform Rights of the Terminally Ill Act (URITA), which provides,

**§ 2 Declaration Relating to Use of Life-Sustaining Treatment**

(a) An individual of sound mind and [18] or more years of age may execute at any time a declaration governing the withholding or withdrawal of life-sustaining treatment ...

URITA § 2(a).

**§ 1 Definitions**

As used in this [Act] unless the context otherwise requires:

(f) "Life–Sustaining treatment" means any medical procedure or intervention

---

**2.** "[P]reference for legislative treatment cannot shackle the courts when legally protected interests are at stake. As people seek to vindicate their constitutional rights, the courts have no alternative but to respond. Legislative inaction cannot serve to close the doors of the courtrooms of this state to its citizens who assert cognizable constitutional rights." *Satz v. Perlmutter,* 379 So.2d 359, 360 (Fla.1980).

**3.** "I suggest the trial court and this Court fulfill their constitutional and lawful duties when the law is followed and upheld—rather than conjuring up reversible error where none exists." *State v. Goree,* —— S.W.2d —— No. 70112 (Mo. banc Nov. 15, 1988) (Billings, C.J., concurring).

**1.** *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973) (affirmed the principle that a person has the right, as found in the Four-

teenth Amendment's due process clause, to control fundamental decisions involving his or her own body); *Schmerber v. California,* 384 U.S. 757, 772, 86 S.Ct. 1826, 1836, 16 L.Ed.2d 908 (1966) ("[t]he integrity of an individual's person is a cherished value of our society"); *Rochin v. California,* 342 U.S. 165, 174, 72 S.Ct. 205, 210, 96 L.Ed. 183 (1952) (forced stomach pumping "offensive to human dignity"); *Union Pac. Ry. Co. v. Botsford,* 141 U.S. 250, 251, 11 S.Ct. 1000, 1001, 35 L.Ed. 734 (1891) ("[n]o right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law.").

that, when administered to a qualified patient, will serve only to prolong the process of dying.

URITA § 1(4).

The Missouri Statute, like the Uniform Act does provide in § 459.015, RSMo 1986, that "[a]ny competent person may execute a declaration directing the withholding or withdrawal of death-prolonging procedures." But, Missouri then defines "death-prolonging procedures" in § 459.010(3), RSMo 1986, as follows:

> **"Death–Prolonging procedure"**, any medical procedure or intervention which, when applied to a patient, would serve only to prolong artificially the dying process and where, in the judgment of the attending physician pursuant to usual and customary medical standards, death will occur within a short time whether or not such procedure is utilized. **Death-prolonging procedure shall not include** the administration of medication or the performance of medical procedure deemed necessary to provide comfort care or to alleviate pain nor **the performance of any procedure to provide nutrition or hydration.**

Section 459.010(3), RSMo 1986 (Emphasis added).

Yes, we Missourians can sign an instrument directing the withholding or withdrawal of death-prolonging procedures, but, after the Missouri amendments, "death-prolonging procedure" does not include: (1) "the administration of medication," (2) "the performance of medical procedure deemed necessary to provide comfort, care or to alleviate pain" (3) "the performance of any procedure to provide nutrition," or (4) "the performance of any procedure to provide ... hydration." If we cannot authorize withdrawing or withholding "medication," "nutrition" or "hydration," then what can we authorize to be withheld in Missouri? The Missouri Living Will Act is a fraud on Missourians who believe we have been given a right to execute a living will, and to die naturally, respectably, and in peace.

It has always been my belief that as a matter of court policy cases of great magnitude, cases that directly affect all of the people of the State, should never be heard or decided by other than the duly appointed regular members of the Supreme Court.[2] Following the special setting of this case and several days prior to the special hearing, I raised this issue with the Court, *obviously without success.* The result that I feared and pointed out to the Court has now come to pass. It is deeply regrettable to me that an issue of this magnitude and importance to every citizen of the State is decided by the single vote of any special judge while the *sitting* members of the regular Court are evenly divided on this issue.

The great body of legal precedent, applied to the facts as properly found below, mandates that this case be affirmed. In the alternative, the Court should recognize what I believe to be the right of the people to have this case decided by the regular members of the Supreme Court. The submission should be set aside and the case reset for hearing before the regular and duly constituted members of the Court.[3]

DISSENT from order denying rehearing

HIGGINS, Judge, dissenting.

Rule 84.17 provides for a rehearing when the Court's decision has overlooked or mis-

---

2. In a case where there is a tie vote of the regular members of the court the result below should be affirmed. *Durant v. Essex Co.*, 74 U.S. (7 Wall) 107, 19 L.Ed. 154 (1868) (a reversal could not be had if the judges were divided, therefore, the judgment of the court below stood in full force); *In re Albany Bridge Case*, 69 U.S. (2 Wall) 403, 17 L.Ed. 876 (1864) (the court being equally divided, the decree was affirmed by necessity); *Etting v. Bank of U.S.*, 24 U.S. (11 Wheat) 59, 6 L.Ed. 419 (1826) (the judgment was affirmed where the Court was evenly divided).

3. While it might be argued that nothing about Nancy's condition requires expediting the case, only a court without compassion could ignore the continuing agonizing pain and suffering of Nancy's family. Barring death or sudden illness, there is no reason why we should not have a full regular court for the balance of the year and our docket is not so heavy as to preclude the rehearing of one specially set case.

interpreted material matters of law or fact as shown by its opinion.

The decision in this case is by a 4 to 3 majority opinion, and when subjected to rehearing scrutiny it matters not what the dissenters may have said. The test is whether the decisional opinion shows that it has overlooked or misinterpreted material matters of law or fact as called to the attention of the Court in the motion for rehearing.

The first ground in Ms. Cruzan's Motion for Rehearing is stated persuasively and, in my opinion, qualifies this case for rehearing under Rule 84.17:

## I. THIS COURT OVERLOOKED OR MISINTERPRETED THE FACTUAL BASIS FOR THE FINDINGS OF THE TRIAL COURT AS TO THE INTENT OF NANCY CRUZAN

This Court recognized in *Cruzan v. Harmon,* No. 70813 (Mo. banc, November 16, 1988) (hereinafter "Slip op."), that incompetent people have certain rights. The Court expressly found that an incompetent person retains her Constitutional "right to life." Slip op. at 426. The Court also found that an incompetent person can determine her own medical treatment if sufficient evidence of that intent is present. Slip op. at 415–416 (the Court cited with approval the tests set out in *In re Conroy,* 98 N.J. 321, 486 A.2d 1209 (1985), as "arguably the only [tests] adopted by a court which adequately consider the state's interest in life in the context of life-sustaining treatment ..."); *see also* slip op. at 423, 424 and 425 ("no person can assume [the right to privacy] choice for an incompetent in the absence of ... clear and convincing, inherently reliable evidence absent here....").

After approving such a test, however, this Court inexplicably failed to apply the test to the express factual findings of Nancy's intent made by the trial court. Instead, the Court made its own "factual findings" of Nancy's intent, and it limited that finding to review of essentially one conversation that Nancy had with her friend, Athena Comer. *See* slip op. at 411 (Court believes that "based on *this* conversation, the trial court concluded that 'she would not wish to continue with nutrition and hydration ...' ") (emphasis added); slip op. at 424 (Nancy's " 'informally expressed reactions to other people's medical condition and treatment do not constitute' clear proof of her intent ..."); slip op. at 424 (Court holds that "statements attributable to Nancy in this case are similarly unreliable for the purpose of determining her intent ..."); *see also* slip op. at 425, 426.

The Court thereby made a material mistake of fact in its interpretation of the factual basis for the trial judge's decision. The trial court in no way limited its finding on Nancy's intentions to the single conversation Nancy had with her friend Athena Comer. Athena Comer's testimony took only a half hour of a three day trial. The court below heard much, much more evidence relevant to Nancy's intent. It heard evidence of other important conversations Nancy had about medical treatment. And it heard witness after witness testify about the kind of person Nancy was, how she felt, and what she believed, told as only those who loved her and whom she loved could know. Tr.Ct.Op. 4 (L.F. 254). An important part of this evidence was the testimony from several different witnesses that Nancy would absolutely not want to subject her family to the torture they now endure. *See, e.g.,* (TR 544) (Nancy's sister, Christy, testified about Nancy's wishes when viewed against the effect of her plight on her parents: "that's an even stronger reason because she loved them so much. She loved her family. Family was very important to Nancy. If she could talk to them, she would say, 'Hey, just a minute, take care of each other ...' ").

After three full days of evidence, the trial judge concluded that Nancy would choose to forego the ongoing intrusion of the gastrostomy tube. The trial judge based this conclusion not only on the conversation with Athena, but on "other statements to family and friends" and

the overwhelming evidence of "[h]er life-style." Tr.Ct.Op. 4, 6 (L.F. 254, 256). Similarly, the independent guardian ad litem, appointed by the trial court to protect Nancy's interest, concluded that the trial court had received clear and convincing evidence that Nancy would want the gastrostomy tube removed. GAL Post-Trial Brief at 32 (L.F. 234, 236).

This Court, sitting in appellate review, is bound under its rules to follow the facts as found by the trial court unless it finds that the decision of the trial court has "no substantial evidence to support it" or that the ruling "is against the weight of the evidence." *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). This Court made absolutely no such ruling here. It reversed the decision of the trial judge on the basis "that the trial court *erroneously declared the law.*" Slip op. at 410 (emphasis added). But the law as found by the trial court and the Supreme Court is exactly the same—"life-sustaining treatment may be withheld or withdrawn from an incompetent patient when it is clear that the particular patient would have refused the treatment under the circumstances involved." *In re Conroy*, 486 A.2d at 1229; *see also* slip op. at 415, 424, 425, 426.

Nancy Cruzan is not required to retry the facts of her case at the appellate level. The trial court, after a full and fair hearing, found clear evidence of Nancy's intent in the testimony of many different witnesses. The State put on no evidence to the contrary. This testimony is exactly the type of evidence that the court in *In re Conroy* found appropriate to examine "in determining what course of treatment the patient would have wished to pursue." 486 A.2d at 1230. This Court misinterpreted the factual finding of the trial court—evidence of Nancy's intent *was not limited to one* conversation with Athena Comer. This material mistake of fact led the Court to commit a material mistake of law in reversing the trial court decision without determination that it was not supported

by substantial evidence. Nancy Cruzan is entitled to a rehearing on this point.

I agree and would grant a rehearing. I dissent, respectfully, from the order denying a rehearing.

## ON MOTION FOR REHEARING

WELLIVER, Judge, dissenting.

I respectfully dissent from the Order denying Rehearing and concur in the dissent filed today by Higgins, J. The appellant-guardian ad litem and the respondents have raised on rehearing the fact that the Court has overlooked Rule 84.15 and § 477.020, RSMo 1986, which provide:

**Rule 84.15. Decision of Majority of Judges Shall Be Decision of Court.**

The decision of the majority of the judges of this Court sitting en banc or of any district of the Court of Appeals sitting en banc shall be the decision of the court, *but if in any case the judges shall be equally divided in opinion* then an additional judge shall be temporarily transferred to the court or district pursuant to Section 6, Article V, of the Constitution and *the case shall be reheard.* The decision of the majority of the judges of a division of this Court shall be the decision of the court unless the case is transferred to the court en banc. Unless pursuant to its own rules a district of the Court of Appeals determines to hear a case en banc, the decision of a majority of a division of that district shall be the decision of the district. (Emphasis ours)

**Section 477.020. Majority decision-special judge appointed, when and by whom.**—The decision of the majority of the judges of the supreme court or of any district of the court of appeals shall be the decision of the court, but if in any case the judges shall be equally divided in opinion, the parties to the cause may agree upon some person learned in the law, who shall act as special judge in the cause, and who shall sit therein with the court, and give decision in the same manner and with the same effect as one of the judges; and such agreement shall be in writing, signed by the parties or their

5

attorneys of record, and filed with the papers and form a part of the record in the cause. If the parties cannot agree upon a special judge, the court shall appoint, by an order of record, some person possessing the qualifications aforesaid, to act as such special judge.

Section 477.020, RSMo 1986.

It was not known until the vote was taken in this case that the regular judges of the Court were evenly divided. The Rule and statute mandate in the clearest possible language that the cause be reheard.

I would order a rehearing before seven regular judges during the January Term, 1989.